No. 26-1349

# In the United States Court of Appeals for the Seventh Circuit

Faculty, Alumni, And Students Opposed To Racial Preferences (FASORP),

*Plaintiff-Appellant*,

v.

Northwestern University, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division
Case No. 1:25-cv-01129

## BRIEF AND REQUIRED SHORT APPENDIX OF PLAINTIFF-APPELLANT FASORP

Gene P. Hamilton
Ryan Giannetti
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
ryan.giannetti@aflegal.org

Jonathan F. Mitchell
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Plaintiff-Appellant FASORP*

## DISCLOSURE STATEMENT OF ATTORNEY JONATHAN F. MITCHELL

1. The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP)

2. The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Mitchell Law PLLC
Stone Hilton PLLC
America First Legal Foundation

3. If the party or amicus is a corporation:

N/A

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel of Record for*
*Plaintiff-Appellant FASORP*

## DISCLOSURE STATEMENT OF ATTORNEY GENE P. HAMILTON

1. The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP)

2. The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Mitchell Law PLLC
Stone Hilton PLLC
America First Legal Foundation

3. If the party or amicus is a corporation:

N/A

/s/ Gene P. Hamilton
Gene P. Hamilton
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

*Counsel for Plaintiff-Appellant FASORP*

## DISCLOSURE STATEMENT OF ATTORNEY RYAN GIANNETTI

1. The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP)

2. The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Mitchell Law PLLC
Stone Hilton PLLC
America First Legal Foundation

3. If the party or amicus is a corporation:

N/A

/s/ Ryan Giannetti
RYAN GIANNETTI
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
ryan.giannetti@aflegal.org

*Counsel for Plaintiff-Appellant FASORP*

**TABLE OF CONTENTS**

Disclosure statement of attorney Jonathan F. Mitchell ..... i

Disclosure statement of attorney Gene P. Hamilton ..... ii

Disclosure statement of attorney Ryan Giannetti ..... iii

Table of contents ..... iv

Table of authorities ..... vi

Statement of jurisdiction ..... 1

Statement of the issues ..... 1

Standard of review ..... 1

Statement of the case ..... 2

I. The district-court proceedings ..... 3

A. FASORP seeks to amend its complaint to add a Title VII claim ..... 3

B. Northwestern demands that FASORP pay all attorneys' fees that it incurred in the dismissed action ..... 4

C. The district court dismisses FASORP's complaint ..... 5

Summary of the argument ..... 5

Argument ..... 7

I. The district court erred in holding that FASORP failed to allege Article III standing to challenge Northwestern's entry-level hiring and law-review policies ..... 7

A. Entry-level hiring ..... 7

B. Law-review article selection ..... 8

C. Law-review membership and editor selection ..... 10

II. The district court erred in holding that FASORP failed to state a claim on which relief may be granted ..... 15

A. The district court erred in holding that FASORP failed to allege a claim for prospective relief under Title VII ..... 15

B. The district court erred in holding that FASORP failed to allege a claim for prospective relief under 42 U.S.C. § 1981 ..... 18

C. The district court erred in holding that FASORP failed to allege a claim for prospective relief under Title VI ..... 20

III. The district court abused its discretion by awarding Northwestern $60,000.00 in attorneys' fees for the time spent writing its Rule 41(d) motion ..... 30

A. FASORP's decision to dismiss and refile was the least expensive and least time-consuming manner of adding its Title VII claim to the case ..... 30

B. FASORP offered to pay Northwestern's court costs in No. 24-5558 before Northwestern filed its Rule 41(d) motion ..... 35

C. The district court abused its discretion by ordering FASORP to pay Northwestern's fees for the time it spent preparing its Rule 41(d) motion ..... 36

Conclusion ..... 43

Certificate of service ..... 44

Certificate of compliance ..... 45

Circuit Rule 30(d) statement ..... 46

Required short appendix table of contents ..... 47

Attached required short appendix .....

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Carlson*, 521 F.2d 168 (7th Cir. 1975) ........................................................ 38

*Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227 (1937) ........................................... 19

*Ahern v. Board of Education of City of Chicago*, 133 F.3d 975 (7th Cir. 1998)..... 20, 25, 28

*Association of Data Processing Service Organizations, Inc. v. Camp*,
397 U.S. 150 (1970)................................................................................................. 12

*Babb v. Wilkie*, 589 U.S. 399 (2020)................................................................................ 20

*Badillo v. Central Steel & Wire Co.*, 717 F.2d 1160 (7th Cir. 1983) ................................ 38

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................... 24

*Bennett v. Roberts*, 295 F.3d 687 (7th Cir. 2002)........................................................... 17

*Berk v. Choy*, 146 S. Ct. 546 (2026)................................................................................. 8

*Bracey v. Grondin*, 712 F.3d 1012 (7th Cir. 2013)......................................................... 36

*Brownlee v. Conine*, 957 F.2d 353 (7th Cir. 1992) ......................................................... 28

*Bruso v. United Airlines, Inc.*, 239 F.3d 848 (7th Cir. 2001).......................................... 17

*Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009)..................................................... 24, 28

*Canter v. AT&T Umbrella Benefit Plan No. 3*, 33 F.4th 949 (7th Cir. 2022) .................. 33

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) .............................................................. 38

*Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978) .......................................... 36

*Christopher v. Harbury*, 536 U.S. 403 (2002) ................................................... 8, 9, 21, 23

*Cieslik v. Board of Education of City of Chicago*,
No. 1:19-CV-05553, 2021 WL 1172575 (N.D. Ill. Mar. 29, 2021)..................... 22, 23

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019)............................................. 13

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)............................................................ 16

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ...................................................... 13

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990).................................................. 40

*Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498 (7th Cir. 2018) ............................. 1

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)................................................ 19

*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991)................................................ 11

*Esposito v. Piatrowski*, 223 F.3d 497 (7th Cir. 2000) ................................ 4, 33, 34, 36, 41

*Evers v. Astrue*, 536 F.3d 651 (7th Cir. 2008) .......... 1

*F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116 (1974) .......... 36

*Federal Deposit Insurance Corp. v. Tekfen Construction and Installation Co.*, 847 F.2d 440 (7th Cir. 1988) .......... 38

*Gratz v. Bollinger*, 539 U.S. 244 (2003) .......... 10, 18, 19

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .......... 18

*In re TCI Ltd.*, 769 F.2d 441 (7th Cir. 1985) .......... 39

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) .......... 11

*Lewis v. City of Chicago*, 496 F.3d 645 (7th Cir. 2007) .......... 17

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......... 24

*Mach v. Will County Sheriff*, 580 F.3d 495 (7th Cir. 2009) .......... 39

*Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802 (2019) .......... 2

*McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976) .......... 15

*Muldrow v. City of St. Louis*, 601 U.S. 346 (2024) .......... 17

*Muskegan Hotels, LLC v. Patel*, 986 F.3d 692 (7th Cir. 2021) .......... 29

*Neitzke v. Williams*, 490 U.S. 319 (1989) .......... 9

*Northeast Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993) .......... 10

*Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113 (7th Cir. 1994) .......... 41

*Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701 (2007) .......... 13

*Pierce v. Zoetis, Inc.*, 818 F.3d 274 (7th Cir. 2016) .......... 29

*Powers v. Ohio*, 499 U.S. 400 (1991) .......... 11

*Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868 (6th Cir. 2000) .......... 41

*Rosas v. Board of Education of City of Chicago*, No. 19-CV-2778, 2025 WL 2712293 (N.D. Ill. Sept. 23, 2025) .......... 22

*Sanderson v. Spectrum Labs, Inc.*, 248 F.3d 1159 (7th Cir. 2000) .......... 34, 36

*Satoskar v. Indiana Real Estate Commission*, 517 F.2d 696 (7th Cir. 1975) .......... 38

*Shankle v. Village of Melrose Park*, No. 16 C 2582, 2018 WL 844422 (N.D. Ill. Feb. 12, 2018) .......... 17

*Silha v. ACT, Inc.*, 807 F.3d 169 (7th Cir. 2015) .......... 8, 14

*Steffel v. Thompson*, 415 U.S. 452 (1974) .......... 16

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008) .......... 17

*Texas v. Lesage*, 528 U.S. 18 (1999) (per curiam) .......... 20

*United States for Use and Benefit of Treat Brothers Co. v. Fidelity and Deposit Co. of Maryland*, 986 F.2d 1110 (7th Cir. 1993) .......... 2, 36

*Veljkovic v. Board of Education of City of Chicago*, No. 20 C 1551, 2020 WL 7626735 (N.D. Ill. Dec. 22, 2020) .......... 22, 23

*Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996) .......... 15

**Statutes**

20 U.S.C. § 956(c)(4) .......... 27

20 U.S.C. § 956(g) .......... 27

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

28 U.S.C. § 2201(a) .......... 19

42 U.S.C. § 1862(a)(1) .......... 26

42 U.S.C. § 1862(a)(5) .......... 26

42 U.S.C. § 1862(c) .......... 26

42 U.S.C. § 282(b)(12) .......... 27

42 U.S.C. § 2000d-3 .......... 20, 25

**Rules**

Fed. R. Civ. P. 12(d) .......... 8

Fed. R. Civ. P. 15(a)(1)–(2) .......... 3

Fed. R. Civ. P. 15(a)(2) .......... 31

Fed. R. Civ. P. 41(a)(1)(A)(i) .......... 4

Fed. R. Civ. P. 41(d) .......... 32, 41

Fed. R. Civ. P. 41(d)(1) .......... 4

**Other Authorities**

Adam Chilton et al., *Assessing Affirmative Action's Diversity Rationale*, 122 Colum. L. Rev. 331 (2022) .......... 15

Kenneth Culp Davis, *The Liberalized Law of Standing*,
37 U. Chi. L. Rev. 450 (1970) ........................................ 12

Richard A. Posner, *Overcoming Law* (1995) ........................................ 14

Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163 (1992) ........................................ 12

## STATEMENT OF JURISDICTION

The district court's jurisdiction rests on 28 U.S.C. § 1331 because the plaintiff is suing under Title VII, 42 U.S.C. § 1981, Title VI, and Title IX.

The appellate jurisdiction of this Court rests on 28 U.S.C. § 1291 because the plaintiff has appealed a final judgment. App. 1–3. The district court entered final judgment on February 13, 2026, and the plaintiff filed a timely notice of appeal on February 14, 2026. *See id.*

The appeal is from an order and final judgment that adjudicated all claims with respect to all parties, and no parties or issues remain in the district court. The plaintiff did not move for a new trial or alteration of the judgment, and no one filed a motion that would toll the time to appeal.

## STATEMENT OF THE ISSUES

1. Did the district court err in holding that FASORP failed to allege Article III standing to challenge Northwestern University's use of race and sex preferences in its law-school entry-level faculty hiring, and in its selection of law-review members, editors, and articles?

2. Did the district court err in holding that FASORP failed to state a claim on which prospective relief may be granted with respect to Northwestern University's use of race and sex preferences in its law-school lateral faculty hiring?

3. Did the district court abuse its discretion by ordering FASORP to pay $60,000.00 in attorneys' fees for the time that Northwestern spent preparing its Rule 41(d) motion?

## STANDARD OF REVIEW

The district court's decision to grant Northwestern's motion to dismiss under Rule 12(b)(1) and 12(b)(6) is reviewed de novo. *See Evers v. Astrue*, 536 F.3d 651, 656 (7th Cir. 2008); *Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498, 500 (7th Cir. 2018). The district court's decision to award Northwestern attorneys' fees

is reviewed for abuse of discretion. *See United States for Use and Benefit of Treat Brothers Co. v. Fidelity and Deposit Co. of Maryland*, 986 F.2d 1110, 1119 (7th Cir. 1993).

## STATEMENT OF THE CASE

Since the installation of then-Dean Daniel Rodriguez in 2012, the Northwestern University School of Law has established and enforced a mandate to hire as many non-white and non-male faculty candidates as possible. App. 86.[1] This hiring mandate, which remains in effect, directs the faculty to intentionally and consciously discriminate in favor of black, Hispanic, Asian, female, homosexual, and transgender candidates, and against white men who are neither homosexual nor transgender. *Id.* Candidates with preferred identities are awarded substantial advantages and chosen over white men with vastly superior publication records and far more impressive educational and professional credentials.

The law school's diversity crusade has reached farcical proportions. It refused to hire renowned and prolific legal scholars Eugene Volokh and Ernest Young solely because they are white men, even though their accomplishments exceed those of nearly every professor on the Northwestern law faculty. App. 86–88. Northwestern also hires patently unqualified black professors solely on account of their race and sex. App. 89–93. All of these episodes are described in detail in FASORP's complaint. App. 83–163.

Northwestern has doubled down on its racial preferences for black faculty candidates since the death of George Floyd, in response to pressure from students who complained that black law faculty are insufficiently represented at Northwestern—

1. The statement of the case will describe the facts as alleged in the complaint, which must be accepted as true at this stage of the proceedings. *See Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 806 (2019) ("[O]n a motion to dismiss, we accept the allegations in the complaint as true.").

even though 8% of the law school's tenure-track faculty (at the time) were black and only 5% of all lawyers are black. App. 94; App. 147–152; App. 153–154. Then-Dean Kim Yuracko, instead of reminding these students that federal law prohibits racial preferences in faculty hiring, issued an "anti-racism" letter announcing that the law school would consciously and intentionally "prioritize" the hiring of black faculty—not only with respect to tenure-track slots but also with its "visiting faculty and adjunct hires." App. 95; App. 155–159. The law school increased its already substantial use of discriminatory and illegal racial preferences in response to these student-led demands. App. 96; App. 96–118.

## I. The District-Court Proceedings

On July 2, 2024, plaintiff FASORP sued Northwestern University and alleged that its faculty-hiring practices violate Title VI, Title IX, and 42 U.S.C. § 1981. FASORP also challenged the use of race and sex preferences on Northwestern's law review. After the defendants moved to dismiss on *Twombly/Iqbal* grounds, FASORP amended its complaint on September 30, 2024, to provide additional factual details. App. 198–257.

### A. FASORP Seeks To Amend Its Complaint To Add A Title VII Claim

On December 26, 2024, FASORP obtained a right-to-sue letter from the EEOC that would allow it to assert a Title VII claim against Northwestern over its faculty hiring. App. 146. Because FASORP had previously amended its complaint, it could not add the Title VII claim without obtaining leave of court or Northwestern's written consent. *See* Fed. R. Civ. P. 15(a)(1)–(2). Northwestern refused to consent to further amendments, so FASORP filed a motion for leave to amend on January 10, 2026. *See* Motion for Leave to Amend (ECF No. 61-46).

The district court decided to hold an in-person hearing on FASORP's motion, and it scheduled the hearing for February 5, 2025. App. 182–183. This would re-

quire counsel for both sides to travel great distances as none of them are based in Chicago. App. 60–61. After researching the law and consulting with other lawyers,[2] FASORP's attorney decided that it would save both sides time and serve judicial economy to dismiss the action without prejudice under Rule 41(a)(1)(A)(i) and file a new lawsuit that includes the Title VII claim,[3] thereby obviating the need for a ruling or an in-person hearing on the contested motion to leave to amend. FASORP dismissed its action on January 31, 2025,[4] five days before the scheduled in-person hearing, and filed its new lawsuit on February 1, 2025. App. 83–163. The civil cover sheet in the refiled action indicates that the case had been previously dismissed and mentioned Judge Ellis to ensure that the new case would be assigned to the same judge. App. 163.

### B. Northwestern Demands That FASORP Pay All Attorneys' Fees That It Incurred In The Dismissed Action

When a plaintiff refiles an action that it previously dismissed, the district court may order the plaintiff to pay "all or part of the costs of that previous action." Fed. R. Civ. P. 41(d)(1). The term "costs" does not include attorneys' fees. *See Esposito v. Piatrowski*, 223 F.3d 497, 500 (7th Cir. 2000) ("Rule 41(d) … does not refer to attorneys' fees as an awardable cost."). FASORP's attorney was aware of Rule 41(d) and *Esposito* when he dismissed and refiled. App. 68. But he determined that any "costs" under Rule 41(d) would be negligible if not zero[5]—and would be dwarfed by the expenses that both sides would incur if forced to travel to Chicago for an in-person hearing on February 5, 2025. App. 60–61. FASORP's attorney also told

---

2. App. 67.
3. Northwestern had not filed an answer or a motion for summary judgment at the time of dismissal, so FASORP could dismiss its action unilaterally and without prejudice. *See* Fed. R. Civ. P. 41(a)(1)(A)(i).
4. App. 165.
5. App. 68.

Northwestern that he would willingly pay the costs (if any) that Northwestern had incurred in the previous action. App. 62–63. Northwestern, however, filed a motion demanding that FASORP pay all attorneys' fees that Northwestern incurred in the dismissed action, plus fees for the time preparing its Rule 41(d) motion. *See* Defs.' Rule 41(d) Motion (ECF No. 17).

The district court ruled that Northwestern could recover only "court costs"[6] incurred in the previous action, and denied Northwestern's request to recover attorneys' fees in the now-dismissed lawsuit. App. 41–44. But the district court ordered FASORP "to pay Defendants the fees they have incurred in bringing this Rule 41(d) motion." App. 44; *see also* App. 36 (awarding Northwestern $60,000.00 in fees).

### C. The District Court Dismisses FASORP's Complaint

On January 22, 2026, the district court dismissed FASORP's complaint. It held that FASORP lacked Article III standing to challenge Northwestern's entry-level faculty hiring or the law review's selection of members, editors, or articles. App. 5.

The district court held that FASORP had alleged standing to challenge Northwestern's lateral faculty-hiring practices. App. 5, 19–21. But it held that FASORP had failed to allege a claim on which relief may be granted with respect to Northwestern's lateral faculty hiring. App. 6, 27–34.

## SUMMARY OF THE ARGUMENT

1. FASORP alleged Article III standing to sue Northwestern over its entry-level law-school faculty hiring. FASORP's members stand able and ready to apply for lateral faculty appointments at Northwestern's law school. And the use of race and sex preferences in entry-level hiring injures candidates for lateral faculty appointments because a tenure or tenure-track faculty line can be filled by either an entry-level or a lateral hire. The district court had no basis for assuming that faculty lines at North-

6. App. 41.

western are reserved exclusively for entry-level or lateral candidates, and FASORP never alleged that the entry-level and lateral faculty hiring processes are hermetically sealed from each other. The district court also erred by rejecting FASORP's standing to challenge the use of race and sex preferences on Northwestern's law review, as FASORP explicitly alleged that the law review's diversity policies will cause FASORP's members to encounter race and sex discrimination when submitting manuscripts. The district court is not permitted to disbelieve those allegations of injury at this stage of the litigation.

2. FASORP alleged that Northwestern University's use of race and sex preferences violates Title VII, 42 U.S.C. § 1981, and Title VI, and it has stated claims on which prospective relief may be granted. The district court held that FASORP needed to allege that Northwestern had previously taken "adverse employment actions" against one or more of FASORP's members. App. 32–33. But FASORP is seeking only prospective relief to enjoin Northwestern's illegal race and sex discrimination *before* its members apply for faculty positions. It is not seeking money damages, back pay, or any type of retrospective relief in response to Northwestern's *past* violations of federal anti-discrimination law. FASORP therefore needs only to allege that Northwestern is currently violating Title VII, 42 U.S.C. § 1981, and Title VI by discriminating against white men in its faculty hiring, and that its members will encounter race and sex discrimination when seeking faculty appointments.

3. The district court abused its discretion by ordering FASORP to pay $60,000.00 in attorneys' fees for the time that Northwestern spent preparing its Rule 41(d) motion. FASORP's decision to dismiss and refile its lawsuit was entirely permissible under the rules of civil procedure—and it saved both sides time and money by obviating the need for an in-person hearing in Chicago on FASORP's contested motion to amend the pleadings. There is nothing remotely unethical or abusive about what FASORP did, and the district court had no basis for declaring

that FASORP had acted in "bad faith" by dismissing and refiling its action. There is also no authority under Rule 41(d) (or any other source of law) that would allow Northwestern to recover attorneys' fees for the time spent preparing its baseless Rule 41(d) motion. The district court correctly rejected Northwestern's demands to recover its attorneys' fees from the previous action, and Northwestern has not appealed the district court's refusal to award those fees under Rule 41(d). There is no justification to award Northwestern attorneys' fees for the time spent on its meritless request to recover fees incurred in the voluntarily dismissed action.

## ARGUMENT

### I. The District Court Erred In Holding That FASORP Failed To Allege Article III Standing To Challenge Northwestern's Entry-Level Hiring And Law-Review Policies

The district court held that FASORP failed to allege Article III standing to sue Northwestern over its entry-level hiring or its selection of law-review members, editors, and articles. App. 21–27. The Court should reverse each of these holdings.

#### A. Entry-Level Hiring

The district court noted that FASORP's members already hold tenured or tenure-track appointments at other law schools, which makes them ineligible for entry-level appointments at Northwestern. App. 21–22. It therefore held that FASORP lacks standing to challenge Northwestern's entry-level practices and can sue only over Northwestern's lateral faculty hiring. *See id*. That is a non sequitur. A tenure or tenure-track faculty line can be filled by either an entry-level or a lateral faculty candidate. So Northwestern's use of race and sex preferences in entry-level hiring injures FASORP by increasing the likelihood that a faculty line will be filled by an entry-level diversity hire rather than a FASORP member seeking a lateral appointment. App. 129–130 ("[T]he pervasive and ongoing use of race and sex preferences at

Northwestern prevents [FASORP's members] from competing with other applicants for faculty positions on an equal basis.").

Nothing in FASORP's complaint alleges that Northwestern's faculty lines are earmarked exclusively for "entry level" or "lateral" candidates. App. 83–145. And a court cannot assume facts that FASORP has not pleaded when ruling on a motion to dismiss. *See* Fed. R. Civ. P. 12(d); *Berk v. Choy*, 146 S. Ct. 546, 553 (2026). Nor can a court construe FASORP's allegations in a manner unfavorable to FASORP. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002) ("[O]n [a] motion to dismiss, we accept [the plaintiff's] factual allegations and take them in the light most favorable to her.").[7] Yet the district court did exactly that by assuming that candidates for entry-level and lateral appointments will never compete with each other for faculty appointments.

### B. Law-Review Article Selection

FASORP alleged that Northwestern's law review discriminates against manuscripts written by white men when selecting articles for publication. App. 118 (¶ 81); App. 120 (¶ 86). It also alleged that these discriminatory article-selection practices injure FASORP's members, who stand able and ready to submit manuscripts to Northwestern's law review yet are unable to compete on an equal playing field with authors from the law review's preferred demographics. App. 131 (¶ 117).

The district court, however, refused to believe FASORP's allegation that the law review discriminates on account of race and sex when selecting articles. App. 26 ("[I]t is a 'speculative leap' to conclude … that NLR is … discriminating against

7. Northwestern brought a "facial" rather than a "factual" challenge to FASORP's Article III standing. App. 16–17; *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (explaining distinction between "facial" and "factual" challenges to subject-matter jurisdiction). The district court was therefore required to "accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.*

straight, white men during the article selection process."). That is not an option at the motion-to-dismiss stage, where *all* factual allegations are presumed true and construed in the manner most favorable to FASORP. *See Christopher*, 536 U.S. at 406; *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations"); *supra*, note 7 (explaining that Northwestern brought a "facial" rather than "factual" Rule 12(b)(1) motion). FASORP alleged that:

- "[T]he Northwestern University Law Review … give[s] discriminatory preferences to articles written by women, racial minorities, homosexuals, or transgender people, while rejecting far better articles written by white men." App. 118 (¶ 81).

- "[T]he Northwestern University Law Review claims that it 'does not discriminate on the basis of race, ethnicity, religion, socioeconomic background, disability, nationality, sexual orientation, gender orientation and identity, or ideological perspective.' That is a bald-faced lie." App. 119 (¶ 82) (citation omitted).

- "The Northwestern University Law Review discriminates on the basis of race, sex, sexual orientation, and gender identity by using affirmative action to select its … articles." App. 119 (¶ 82).

- "The Northwestern University Law Review has … established a position on its editorial board for a 'senior equity and inclusion editor' …. The purpose of this office is to ensure that women, racial minorities, and homosexual and transgender individuals are given illegal discriminatory preferences over white heterosexual and non-transgender men, both with respect to the selection of student members and editors as well as the selection of articles." App. 120 (¶ 84).

- "The Law Review … engages in race and sex discrimination when deciding which articles it will publish." App. 120 (¶ 86).

- "The Northwestern University Law Review requires its members and editors to sign nondisclosure agreements for the purpose of preventing them from exposing the race and sex preferences that the Law Review uses when selecting its articles, editors, and members." App. 122 (¶ 88).

All of these factual allegations *must* be presumed true at this stage of the litigation. Yet the district court assumed them to be false, declaring FASORP's accusations of race and sex discrimination "speculative" even though they were explicitly averred in the complaint. But FASORP does not need to prove its allegations; it needs only to allege facts that, if accepted as true, would establish Article III standing. The district court did not deny that FASORP had alleged that Northwestern's law review discriminates in favor of women, racial minorities, and homosexual or transgender authors when selecting articles. And the district court did not (and could not) deny that these race and sex preferences inflict Article III injury on white men who intend to submit manuscripts to the law review. *See Gratz v. Bollinger*, 539 U.S. 244, 262 (2003); *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993). Nothing more is needed to allege Article III standing with respect to the law review's article-selection policies.

### C. Law-Review Membership And Editor Selection

FASORP alleged that Northwestern's use of race and sex preferences in selecting law-review members and editors injures FASORP in two respects. First, it dilutes the quality of the students who vote on whether to accept manuscripts submitted by FASORP's members. App. 132 (¶ 118). Second, it makes the law review less likely to accept articles written by FASORP's members, as students who obtain their law-review positions through race and sex preferences are more likely to discriminate against white male authors at the article-selection stage. *Id.* All of this must be assumed true on a motion to dismiss—and all of this inflicts injury on FASORP members who stand "able and ready" to submit manuscripts to Northwestern's law review. App. 131 (¶ 117).

The district court denied that the first of these two harms qualifies as injury in fact. App. 25 ("[T]he Court cannot agree that this is an injury in fact"). But an au-

thor who submits his manuscripts to a law review suffers Article III injury whenever the students who decide whether to publish his article are chosen by diversity criteria rather than merits. This is no less an Article III injury than the injury alleged in *Powers v. Ohio*, 499 U.S. 400 (1991), where a white criminal defendant complained that the prosecutor had used his peremptory challenges in a racially discriminatory manner. *See id.* at 403–04. The Supreme Court held that the mere fact that the juror-selection process was tainted by unlawful racial discrimination inflicted injury on the criminal defendant who was to be judged by this improperly selected jury—even though the defendant had made no showing that excluded jurors were predisposed to rule in his favor, and even though the defendant had not alleged (and could not possibly show) that the excluded jurors were more qualified to serve than the jurors who were ultimately seated. *See id.* at 411 ("The discriminatory use of peremptory challenges by the prosecution causes a criminal defendant cognizable injury, and the defendant has a concrete interest in challenging the practice."). It was enough for the defendant to allege that the discriminatory practices had altered the composition of the jury that would decide his guilt or innocence, even though the defendant had no way of showing that the *outcome* of his trial had been affected in any way. *See also Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) (extending *Powers* to civil litigants who allege racial discrimination in juror selection); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (extending *Powers* to sex discrimination in juror selection).

FASORP has an even stronger case for injury in fact because there are objective criteria that measure a student's ability and qualifications for membership on the law review—law-school grades and blind-graded writing-competition scores—and the law review's policies have *subordinated* these merit-based criteria to race and sex preferences. FASORP can therefore plausibly allege—which the litigants in *Powers*, *Edmonson*, and *J.E.B.* could not do—that the law review's discriminatory practices

have not only altered the identity of the students who decide whether to accept an article for publication, but have also diluted the credentials and aptitude of the students who sit in judgment of those articles.

The district court tried to distinguish *Powers* by claiming that racial discrimination in jury selection violates the Constitution and "undermines the purpose of the jury system." App. 25 (cleaned up). But those observations go to the merits, and they have nothing to do with whether FASORP's members suffer Article III injury when those who evaluate and judge their submissions are chosen by criteria that prioritize diversity over merit. The district court also claimed that "there is no legal right to have one's article reviewed or published by a student-run academic law journal." App. 25 (quoting *FASORP v. New York University*, 2020 WL 1529311, *6 (S.D.N.Y. March 31, 2020)). But "legal right" is not the test for injury under Article III; the standard is "injury in fact." *See Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970); Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L. Rev. 163, 185 (1992) ("[T]he *Data Processing* Court concluded that a plaintiff no longer needed to show a 'legal interest' or 'legal injury' to establish standing."); Kenneth Culp Davis, *The Liberalized Law of Standing*, 37 U. Chi. L. Rev. 450, 457 (1970) ("In *Data Processing* … the Supreme Court unanimously superseded a large batch of law [holding] … that something in the nature of a 'legal right' or 'legal interest' was necessary for standing."). A person suffers "injury in fact" whenever race or sex discrimination alters the composition of a body that sits in judgment of his scholarship—in the same way that a criminal defendant suffers "injury in fact" when discriminatory juror-selection practices alter the composition of the entity that decides his civil or criminal liability.

The district court held that FASORP's second harm—that student editors who are chosen for diversity reasons are more likely to discriminate against articles writ-

ten by white men—was too "hypothetical" and "attenuated" to qualify as injury in fact. App. 24 (citations omitted). But FASORP alleged that it is *certain*, not merely possible, that diversity hires on the law review's editorial board are more likely to discriminate against white male authors than editors who earned their law-review positions through merit. App. 132 (¶ 118). So there is nothing "hypothetical" about this alleged injury. And an author suffers injury in fact whenever his manuscripts are subjected to discriminatory consideration on account of his race or sex, regardless of whether that discrimination alters the ultimate decision to accept or reject a submission. *See Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 719 (2007) ("[O]ne form of injury under the Equal Protection Clause is being forced to compete in a race-based system that may prejudice the plaintiff"); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) ("[The] inability to compete on an even playing field constitutes a concrete and particularized injury."). The district court was also wrong to characterize Northwestern's law-review editors as "independent actors,"[8] as the law review is part of Northwestern University and will remain bound by the judgment. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) ("Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the court.'" (citation and some internal quotation marks omitted)).

The district court also denied the truth of FASORP's allegations that the Northwestern University Law Review discriminates on account of race and sex when selecting its members and editors. App. 24 ("The Court cannot plausibly infer from these allegations alone that NLR's review editors generally discriminate during the member and editor selection process"). That is impermissible when ruling on a facial

8. App. 24.

Rule 12(b)(1) motion. *See Silha*, 807 F.3d at 173; App. 16–17. FASORP alleged in no uncertain terms that:

- "The student editors of the Northwestern University Law Review give discriminatory preferences to women, racial minorities, homosexuals, and transgender people when selecting their members and editors …." App. 118 (¶ 81).

- "[T]he Law Review solicits 'personal statements' from student applicants. Students are encouraged to use these personal statements to signal their race, sexual orientation, and gender identity, and the Law Review editors use these personal statements to discriminate against white men and in favor of women, racial minorities, homosexuals, and transgender people." App. 119 (¶ 82).

- "The personal statements are relied upon solely for the purpose of awarding discriminatory preferences to women, racial minorities, homosexuals, and transgender people who would not have earned a position on the law review with their academic credentials and performance …." App. 119 (¶ 83).

- "The Law Review will continue these discriminatory and unlawful membership-selection practices until a court enjoins it from doing so." App. 120 (¶ 85).

The district court was required to accept the truth of these allegations and construe them in the light most favorable to FASORP.

The district court appeared to think that it could escape this obligation by denying the "plausibility" of FASORP's allegations under *Twombly* and *Iqbal*. App. 24. But it is common knowledge that student-edited law reviews use race and sex preferences to select their members. *See* Richard A. Posner, *Overcoming Law* 77 (1995) ("The *Harvard Law Review*, with its epicycles of affirmative action, is on the way to becoming a laughingstock."). Scholars have conducted empirical studies on how the Northwestern University Law Review's (and other law reviews') use of race and sex preferences in selecting members has affected the quality of the articles that they publish. *See* Adam Chilton et al., *Assessing Affirmative Action's Diversity Rationale*,

122 Colum. L. Rev. 331, 362 (2022). A court cannot dismiss FASORP's allegations as "implausible" when law reviews throughout the country are openly using race and sex preferences to select their members and editors—and when this practice is openly acknowledged in the academic literature.

## II. The District Court Erred In Holding That FASORP Failed To State A Claim On Which Relief May Be Granted

The district court held that FASORP failed to allege violations of Title VII, 42 U.S.C. § 1981, or Title VI with respect to Northwestern's lateral faculty-hiring practices. The Court should reverse each of these holdings.[9]

### A. The District Court Erred In Holding That FASORP Failed To Allege A Claim For Prospective Relief Under Title VII

The district court held that FASORP failed to even *allege* a violation of Title VII—even though the complaint specifically describes Northwestern's longstanding and ongoing policy of discriminating against white men in faculty hiring. App. 86–101. The district court did not deny that the discriminatory race and sex preferences described in FASORP's complaint violate Title VII's prohibitions on race and sex discrimination.[10] And FASORP specifically alleged that its members intend to apply for lateral faculty appointments at Northwestern and will encounter illegal race and sex discrimination when doing so. App. 128–131. The district court acknowledged these allegations and held that they give FASORP standing to challenge Northwestern's lateral faculty-hiring practices. App. 19–20.

---

9. The district court dismissed FASORP's Title IX claim under *Waid v. Merrill Area Public Schools*, 91 F.3d 857 (7th Cir. 1996), which prohibits plaintiffs from litigating employment-discrimination claims under Title IX if Title VII provides an equivalent remedy. *See id.* at 861–63; App. 31. FASORP acknowledges that *Waid* binds the panel but may seek the overruling of *Waid* before the en banc court or the Supreme Court.

10. Nor could it, given that Title VII protects whites from racial discrimination on the same terms that it protects racial minorities. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 278–79 (1976).

So how could the district court rule that FASORP had failed to allege a violation of Title VII? According to the district court, FASORP was required to allege that Northwestern has already taken adverse employment actions against FASORP's members. App. 32 ("Here, FASORP has not alleged that Northwestern instituted any adverse employment actions against any FASORP members."). But allegations of that sort are unnecessary and improper when a plaintiff is suing solely for *prospective* relief to enjoin *future* violations of Title VII. FASORP is not suing to remedy past Title VII violations committed by Northwestern, and it is not seeking damages or any type of retrospective relief. FASORP is seeking only declaratory and injunctive relief that will eliminate Northwestern's use of race or sex preferences going forward, so that its members will not encounter illegal race and sex discrimination when applying for faculty appointments in the future. App. 142–144.

It is absurd to require a prospective job applicant who is suing to *prevent* an employer from unlawfully discriminating against him when he applies to allege and prove that the defendant has already taken adverse employment actions against him. A plaintiff who sues to prevent a defendant from harming him in the future is not required to allege or prove that the defendant has already inflicted the injury that the plaintiff is seeking to avoid. *See Steffel v. Thompson*, 415 U.S. 452, 459 (1974). And even if FASORP had claimed that Northwestern had previously taken adverse employment actions against its members, that would not confer standing to pursue any of the prospective relief that FASORP is seeking in this litigation. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983) (past injury does not confer standing to seek prospective relief). So allegations of past harm are neither necessary nor sufficient to state a claim for prospective relief under Title VII. FASORP needs only to allege is that its members will encounter illegal race and sex discrimination when they apply for lateral faculty appointments at Northwestern.

The cases cited by the district court involved plaintiffs who sought retrospective relief over *past* Title VII violations. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024) (plaintiff sued employer because it "transferred her from one job to another because she is a woman"); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1078–80 (7th Cir. 2008) (plaintiff sued former employer for demoting and ostracizing her to the point of constructive discharge on account of her sex); *Lewis v. City of Chicago*, 496 F.3d 645, 648–50 (7th Cir. 2007) (plaintiff sued employer for past acts of sex discrimination and retaliation committed against her);[11] *Shankle v. Village of Melrose Park*, No. 16 C 2582, 2018 WL 844422, *1 (N.D. Ill. Feb. 12, 2018) (same). And if FASORP were seeking retrospective remedies or demanding relief that would redress Northwestern's *past* violations of Title VII, then it would need to establish that one or more of its members suffered some type of past adverse employment action at the hands of Northwestern. *See, e.g.*, *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002) (describing the elements that a Title VII plaintiff must prove when suing an employer over a past failure to hire).

But none of these cases hold that a plaintiff who seeks only *prospective* relief to enjoin an employer from committing *future* violations of Title VII must allege or prove that he has already experienced an adverse employment action. *Cf. Bruso v. United Airlines, Inc.*, 239 F.3d 848, 864 (7th Cir. 2001) (holding that when a Title VII plaintiff seeks injunctive relief, "[t]he relevant inquiry … is whether the employer's discriminatory conduct could possibly persist in the future"). A prospective job applicant who intends to seek future employment from Northwestern may sue to

11. The language that the district court quoted from *Lewis*, which required Title VII plaintiffs to prove "a *significant* change in employment status," App. 32 (quoting *Lewis*, 496 F.3d at 653 (emphasis added)), was overruled in *Muldrow*, which holds that Title VII plaintiffs "need not show that the injury satisfies a significance test." *Muldrow*, 601 U.S. at 972.

enjoin its discriminatory hiring practices before he subjects himself to illegal race and sex discrimination.

### B. The District Court Erred In Holding That FASORP Failed To Allege A Claim For Prospective Relief Under 42 U.S.C. § 1981

The district court similarly erred in dismissing FASORP's section 1981 claim. It held that FASORP was required to allege that Northwestern had previously "instituted a specific adverse employment action against" one or more of its members because of their race. App. 33 (quoting *Sanchez v. Tootsie Roll Industries, LLC*, No. 19-CV-4527, 2021 WL 4936240, at *5 (N.D. Ill. May 18, 2021)). It also held that FASORP must "plead … that, but for race, it would not have suffered the loss of a legally protected right." App. 33 (quoting *Comcast Corp. v. National Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020)). But FASORP is not suing for damages over Northwestern's past acts of racial discrimination; it is seeking only *prospective* relief that will restrain Northwestern from using racial preferences in its *future* hiring decisions.

There is no need to allege "but-for causation" or a previous "adverse employment action" when a plaintiff is seeking only forward-looking relief under 42 U.S.C. § 1981. And it is nonsensical to speak of "but-for causation" when there is no past injury or harm to the plaintiff that the defendant is alleged to have "caused." When a plaintiff sues only for prospective relief under section 1981, the pleading and proof requirements are no different from those in lawsuits seeking to enjoin future acts of racial discrimination under the Equal Protection Clause. *See Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) ("[T]he prohibition against discrimination in § 1981 is coextensive with the Equal Protection Clause." (citation omitted)); *Gratz*, 539 U.S. at 276 n.23 ("[P]urposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981.").

Plaintiffs that seek to *enjoin* affirmative-action policies under 42 U.S.C. § 1981 are not required to prove but-for causation; they need only satisfy the four-part test for a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction … must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."). And a plaintiff that seeks a *declaration* of his statutory rights under 42 U.S.C. § 1981 (or any other statute) needs only to show that he is an "interested party seeking such declaration," *i.e.*, that his request for declaratory relief satisfies Article III's case or controversy requirement by redressing an ongoing or future injury. *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."); *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41 (1937). FASORP easily clears these hurdles because it alleges that its members stand "able and ready" to apply for faculty positions at Northwestern's law school and submit articles to its law review, and that they will encounter racial discrimination at the hands of the defendants absent declaratory and injunctive relief. Nothing more is needed to state a claim for prospective relief under 42 U.S.C. § 1981. And *Gratz* proves this because it awarded relief under 42 U.S.C. § 1981 simply because the plaintiffs had shown that: (1) they were "able and ready to apply" to the University of Michigan,[12] and (2) they would encounter unconstitutional racial discrimination when applying. *See Gratz*, 539 U.S. at 275–76 ("[B]ecause the University's use of

12. *See Gratz*, 539 U.S. at 260–68.

race in its current freshman admissions policy is not narrowly tailored to achieve respondents' asserted compelling interest in diversity, the admissions policy violates … 42 U.S.C. § 1981.").[13]

### C. The District Court Erred In Holding That FASORP Failed To Allege A Claim For Prospective Relief Under Title VI

In the Seventh Circuit, plaintiffs cannot bring employment-discrimination claims under Title VI unless "(1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Ahern v. Board of Education of City of Chicago*, 133 F.3d 975, 978 (7th Cir. 1998) (citation omitted).[14] The district court held that FASORP had failed to allege that the provision of employment is a primary objective of Northwestern's federal aid. App. 28–30. It also held that FASORP had failed to allege that Northwestern's discriminatory faculty-hiring prac-

13. To be sure, the plaintiffs in *Gratz* could not have obtained *damages* from the defendants—under either 42 U.S.C. § 1981 or the Equal Protection Clause—absent proof of but-for causation, *i.e.*, proof that the university's affirmative-action policies caused them to be rejected when they would have been accepted under a colorblind admissions process. *See Texas v. Lesage*, 528 U.S. 18, 20–21 (1999) (per curiam); *Babb v. Wilkie*, 589 U.S. 399, 413 (2020). But FASORP is not seeking damages or retrospective relief in this lawsuit.

14. FASORP respectfully disagrees with the holding of *Ahern*, as the language of Title VI imposes no such limitations on its scope or the use of private rights of action to enforce it. *See* 42 U.S.C. § 2000d *et seq*. *Ahern* based its holding on the text of 42 U.S.C. § 2000d-3, which says:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter *by any department or agency* with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d-3 (emphasis added). This language does not curtail FASORP's claims against Northwestern because FASORP is not a "department or agency." FASORP acknowledges that *Ahern* binds the panel but wishes to preserve its disagreement with *Ahern* for en banc consideration or proceedings in the Supreme Court.

tices necessarily cause discrimination against the primary beneficiaries of federal aid. App. 30–31. The district court was wrong on both counts.

### 1. FASORP Alleged That Providing Employment Is A Primary Objective Of Northwestern's Federal Aid

FASORP's complaint explicitly alleges that providing employment is "a primary objective" of at least some of the federal funding that Northwestern receives:

> Providing employment is a "primary objective" of the research grants that the federal government provides to institutions such as Northwestern, as federal research money is used to employ university faculty on research tasks that the federal government wishes to fund.

App. 135 (¶ 134). FASORP also attached to its brief opposing dismissal a list of the many research grants that Northwestern had received from the federal government,[15] although it did not need to do this as factual evidence is not required to defeat a motion to dismiss.

The district court was required to accept the truth of FASORP's allegation that providing employment is "a primary objective" of at least some of Northwestern's federal research grants. *See Christopher*, 536 U.S. at 406 ("Since we are reviewing a ruling on motion to dismiss, we accept [the plaintiff's] factual allegations and take them in the light most favorable to her."). It was also required to construe this allegation in the light most favorable to FASORP. *See id*. The district court violated each of these cardinal rules for adjudicating a motion to dismiss.

First. The district court claimed that FASORP needed to "establish" rather than merely "allege" that at least one of Northwestern's federal grants had a primary objective or providing employment. App. 28 ("FASORP has fallen far short of *establishing* that any of Northwestern's federal funding has a primary objective of providing employment." (emphasis added)); App. 29 ("[T]he Court … cannot conclude

---

15. App. 45–53; *see also* App. 29 n.7 (district court acknowledging that it "can properly consider" these exhibits).

that the first *Ahern* exception applies."); App. 30 ("While FASORP argues that these funds primarily benefit university faculty, none of the exhibits cited support this proposition."). But FASORP does not need to *show* that any of Northwestern's federal funds have a primary objective of providing employment at this stage of the litigation; it needs only to *allege* this. And the district court is not to determine whether any of Northwestern's federal grants *actually have* a primary objective that satisfies the *Ahern* test when adjudicating a motion to dismiss. The district court's task is to assess only whether FASORP has alleged that one or more these federal grants have a primary objective of providing employment. Whether any of Northwestern's federal grants actually have a primary objective of providing employment is to be determined later—after every federal grant to Northwestern is introduced into evidence and evaluated by the district court to determine what its primary objectives might be. This cannot be done at the motion-to-dismiss stage when there is no record evidence of the extent of Northwestern's federal funding, and when there is no evidence of the primary objectives behind every federal grant that Northwestern receives.[16]

16. The district court claimed that three unpublished opinions support dismissal of FASORP's Title VI claim. App. 29 (citing *Rosas v. Board of Education of City of Chicago*, No. 19-CV-2778, 2025 WL 2712293 (N.D. Ill. Sept. 23, 2025); *Cieslik v. Board of Education of City of Chicago*, No. 1:19-CV-05553, 2021 WL 1172575 (N.D. Ill. Mar. 29, 2021); and *Veljkovic v. Board of Education of City of Chicago*, No. 20 C 1551, 2020 WL 7626735 (N.D. Ill. Dec. 22, 2020)). But *Rosas* was decided on summary judgment, where plaintiffs must produce *evidence* and not mere allegations of the "primary objectives" of federal funding. *See Rosas*, 2025 WL 2712293, at *11 ("Plaintiff *offers no argument or evidence that* employment is the primary objective of the Title III funds" (emphasis added)). *Rosas* provides no support for the district court's holding that FASORP failed to *allege* that providing employment was "a primary objective" of at least one of Northwestern's federal grants.

*Cieslik* and *Veljkovic* are inapposite because the only source of federal funds provided to the defendant in those cases was Title I of the Elementary and Secondary Education Act, 20 U.S.C. § 6301 et seq., which has a statutorily defined purpose that omits any mention of employment. *See Cieslik*, 2021 WL

Second. The district court failed to construe FASORP's allegations in the light most favorable to the party opposing dismissal. *See Christopher*, 536 U.S. at 406. The district court claimed that FASORP had merely alleged that Northwestern's federal funding supports employment, which did not (in the district court's view) qualify as an allegation that employment serves as a "primary objective" of one or more of the federal grants that Northwestern receives. App. 29 ("The mere fact that federal funds support employment does not, in and of itself, establish that employment is the *primary objective* of that funding."). But FASORP's allegations went beyond a mere assertion that Northwestern's federal funding "supports employment." FASORP alleged:

> *Providing employment is a "primary objective"* of the research grants that the federal government provides to institutions such as North-

---

1172575, at *3 ("[T]he statutorily defined purpose of Title I is to 'provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps.'" (citing 20 U.S.C. § 6301)); *Veljkovic*, 2020 WL 7626735, at *3 (same). *Cieslik* is doubly inapposite because the plaintiff in that case failed to even allege that the provision of employment serves as a "primary objective" of the federal funding that the defendant school district received. *Compare Cieslik*, 2021 WL 1172575, at *3 ("[T]he Plaintiffs fail to allege that employment is the primary objective of federal funding to the Chicago Public Schools or to York. Although the Plaintiffs do allege that the Board received federal funding, they do not allege what the purpose of that funding is." (citation omitted)) *with* App. 135 (¶ 134) ("Providing employment is a 'primary objective' of the research grants that the federal government provides to institutions such as Northwestern").

The district court acknowledged that *Cieslik*'s holding was limited to Title I but thought that it could carry over *Cieslik*'s Title I holding to *every* source of federal funding that Northwestern receives. App. 29 n.6. But the district court did not list or analyze every federal grant and every source of federal funds provided to Northwestern, and it made no attempt to determine the "primary objectives" behind every one of these funding streams. It is impossible for a court to conduct this analysis at the motion-to-dismiss stage, before evidence of the extent of Northwestern's federal funding—and evidence of the "primary objectives" behind each of those individual grants and funding sources—has been discovered and presented to the court.

> western, as federal research money is *used to employ* university faculty on research tasks that the federal government wishes to fund.

App. 135 (¶ 134) (emphasis added). The district court construed this allegation in the light most favorable to Northwestern rather than FASORP by: (1) claiming that FASORP had provided nothing more than an allegation that federal funding "supports" the employment of faculty, when the allegation goes beyond that by claiming that federal research money is "used to employ" faculty at Northwestern; (2) assuming that the use of federal research funds to employ university faculty is the *only* way that FASORP might eventually show that the provision of employment serves as "a primary objective" of one or more of Northwestern's federal grants; and (3) ignoring FASORP's allegation that "providing employment is a 'primary objective' of the research grants" that Northwestern receives,[17] an allegation that must be assumed true when adjudicating a motion to dismiss. The district court should have construed FASORP's complaint as describing merely one of the many possible ways in which the provision of employment serves as "a primary objective" of one or more of the federal grants that Northwestern receives, while acknowledging that a complaint is not required to explain every way in which one or more of Northwestern's grants serves the "objective" of providing employment. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[O]n a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (citation and internal quotation marks omitted)); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) ("Plaintiffs need not lard their complaints with facts; the federal system uses notice pleading rather than fact pleading.").

---

17. App. 135 (¶ 134).

The district court also appeared to believe that there can be only one "primary objective" for the federal funding that Northwestern University receives. App. 28–30. Its discussion repeatedly refers to "*the* primary objective"[18] of Northwestern's federal funding, using a definite article that implies that there can be one and only one "primary objective" of those funds. But *Ahern* and 42 U.S.C. § 2000d-3 each use an indefinite article, which allows for multiple "primary objectives" of each federal grant that Northwestern receives. *See Ahern*, 133 F.3d at 978 ("Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is *a primary objective* of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." (emphasis added) (citation and internal quotation marks omitted)); 42 U.S.C. § 2000d-3 ("Nothing contained in this subchapter shall be construed to authorize action under this subchapter *by any department or agency* with respect to any employment practice of any employer, employment agency, or labor organization except where *a primary objective* of the Federal financial assistance is to provide employment." (emphasis added)). The Court should make clear that neither *Ahern* nor 42 U.S.C. § 2000d-3 forecloses the possibility of multiple "primary objectives" behind a particular source of federal funding.

Finally, the district court was wrong to claim that the statutes establishing the National Science Foundation, the National Institutes for Health, and the National Endowment for the Humanities foreclose any possibility that Northwestern might receive a federal grant with a "primary objective" of providing employment. App.

18. App. 29 ("The mere fact that federal funds support employment does not, in and of itself, establish that employment is *the* primary objective of that funding." (emphasis added and removed); App. 30 ("Because employment is not *the* primary objective of this federal funding, the first *Ahern* exception does not apply." (emphasis added)).

29–30. The statute governing the National Science Foundation, for example, authorizes the foundation to:

> initiate and support basic scientific research and programs to strengthen scientific research potential and science education programs at all levels in the mathematical, physical, medical, biological, social, and other sciences, and to initiate and support research fundamental to the engineering process and programs to strengthen engineering research potential and engineering education programs at all levels in the various fields of engineering, by making contracts or other arrangements (including grants, loans, and other forms of assistance) to support such scientific, engineering, and educational activities and to appraise the impact of research upon industrial development and upon the general welfare;

42 U.S.C. § 1862(a)(1). The "scientific research and programs" that NSF "initiates" and "supports" cannot exist without the employment of qualified researchers, and one cannot "initiate" scientific research and programs without employing individuals to carry out the newly initiated research and programs. Another provision of the statute authorizes NSF to:

> evaluate the status and needs of the various sciences and fields of engineering as evidenced by programs, projects, and studies undertaken by agencies of the Federal Government, by individuals, and by public and private research groups, *employing by grant or contract such consulting services as it may deem necessary for the purpose of such evaluations* ….

42 U.S.C. § 1862(a)(5) (emphasis added). This subsection authorizes NSF to award grants or contracts for the purpose of "employing" consulting services needed to conduct evaluations, so providing employment should qualify as a "primary objective" of these NSF contracts or grants. *See also* 42 U.S.C. § 1862(c) (authorizing NSF to "employ by grant or contract such consulting services as it deems necessary"). At the very least, the "primary objective" of a particular NSF grant must be determined by examining the specific grant and its purposes. The district court can-

not categorically rule out the provision of employment as an objective before the individual NSF grants to Northwestern are identified and scrutinized.

The statute governing the National Institutes of Health lists over 29 subsections of duties and authorities, and many of the individual grants awarded under these provisions could have the provision of employment as one of their "primary objectives." 42 U.S.C. § 282(b)(12), for example, authorizes NIH to fund "research on matters that have not received significant funding relative to other matters," and each individual NIH grant to Northwestern would need to be examined to determine whether the provision of employment serves as one of its "primary objectives." The same is true for the National Endowment for the Humanities, whose statute empowers it to "initiate and support programs and research which have substantial scholarly and cultural significance and that reach, or reflect the diversity and richness of our American cultural heritage, including the culture of, a minority, inner city, rural, or tribal community." 20 U.S.C. § 956(c)(4). Many of these grants, especially those that "initiate" programs and research, will have a "primary objective" of providing employment because a "program" cannot be "initiated" without first employing individuals to carry out the program. *See also* 20 U.S.C. § 956(g) (requiring that "all professional performers and related or supporting professional personnel employed on projects or productions which are financed in whole or in part under this section will be paid … not less than the minimum [wage]").

### 2. FASORP Alleged That Northwestern's Discriminatory Faculty-Hiring Practices Necessarily Cause Discrimination Against The Primary Beneficiaries Of The Federal Aid

Even if FASORP had failed to allege that the provision of employment serves "a primary objective" of at least one of Northwestern's federal grants, FASORP's Title VI claim should nonetheless survive because FASORP explicitly pleaded that Northwestern's discriminatory faculty-hiring practices will necessarily cause discrimi-

nation against the primary beneficiaries of the federal aid. *See Ahern*, 133 F.3d at 978. Paragraph 134 of its complaint states:

> Northwestern's discriminatory faculty-hiring practices "necessarily cause[ ] discrimination against the primary beneficiaries of the federal aid," as university faculty are "primary beneficiaries" of federal research grants as well as the subsidized grants and loans that the federal government provides to university students.

App. 135 (¶ 134). The district court refused to accept the truth of this allegation, brushing it aside as "conclusory." App. 30 ("[S]uch conclusory allegations are insufficient to avoid dismissal."); *but see Brownlee v. Conine*, 957 F.2d 353, 354 (7th Cir. 1992) ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliché means, does not automatically condemn it." (citations omitted)). But there is nothing "conclusory" about what FASORP alleged; it identified the particular categories of federal funding that Northwestern receives—federal research grants as well as the subsidized grants and loans provided to university students—and alleged that university faculty are "primary beneficiaries" of that federal aid. The district court did not hold that university faculty cannot qualify as "primary beneficiaries" of this federal aid as a matter of law. Nor did the district court deny that that race and sex preferences in faculty hiring "necessarily cause discrimination against" university faculty. App. 135 (¶ 134).

Instead, the district court criticized FASORP for failing to include "factual allegations to support an inference that Northwestern Law faculty are the primary beneficiaries of these forms of federal aid." App. 30. But FASORP is not required to prove that contention at the pleading stage, nor is it required to "lard" its complaint with factual details explaining how Northwestern's faculty become primary beneficiaries of some or all of the federal aid that Northwestern receives. *Burks*, 555 F.3d at 594 ("Plaintiffs need not lard their complaints with facts"); *see also id.* ("[L]ack of

detail does not permit dismissal."). FASORP needs only to *allege* that university faculty are primary beneficiaries of at least some of the federal aid that Northwestern receives—and FASORP has done exactly that. App. 135 (¶ 134) ("[U]niversity faculty are 'primary beneficiaries' of federal research grants as well as the subsidized grants and loans that the federal government provides to university students."). The district court did not (and could not) deny the truth of this allegation, and it did not assert or argue that this allegation flunked the "plausibility" test of *Twombly* and *Iqbal*. The district court must allow FASORP to take discovery on the extent of Northwestern's federal aid and the objectives and beneficiaries of each federal grant that Northwestern receives. Only after the record has been developed can the district court determine whether Northwestern's faculty are indeed "primary beneficiaries" of any of the federal government's munificence.[19]

19. The district court also criticized FASORP for acknowledging earlier in its complaint that students are primary beneficiaries of the grants and loans that the federal government provides to university students. App. 30; App. 134 (¶ 130) ("University faculty are also intended beneficiaries of the grants and loans that the federal government provides to university students, even though students are the primary beneficiaries of these programs"). But this allegation does not foreclose the possibility that both students and faculty can be "primary beneficiaries" of this aid, and it does nothing to undermine FASORP's claim that university faculty are primary beneficiaries of federal research grants or other forms of federal aid. *See Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 695 (7th Cir. 2021) ("On a motion to dismiss, we take the facts stated in the operative complaint as true and view them in the light most favorable to the non-moving parties"); *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016) ("We … draw all reasonable inferences in [the plaintiff's] favor."). Northwestern University accepts money from *many* different sources of federal aid—some of which primarily benefit students and others that primarily benefit faculty.

## III. The District Court Abused Its Discretion By Awarding Northwestern $60,000.00 In Attorneys' Fees For The Time Spent Writing Its Rule 41(d) Motion

After FASORP dismissed and refiled its case to add the Title VII claim, Northwestern demanded that FASORP pay not only the costs but also the attorneys' fees that it had incurred in the now-dismissed action under Rule 41(d). The district court denied Northwestern's request to recover attorneys' fees in the previous action. App. 43–44. But it held that FASORP had acted in "bad faith" by dismissing and refiling and ordered FASORP to pay $60,000.00 in attorneys' fees for the time that Northwestern spent preparing its Rule 41(d) motion. App. 42–44. The Court should vacate this fee award as an abuse of discretion.

### A. FASORP's Decision To Dismiss And Refile Was The Least Expensive And Least Time-Consuming Manner Of Adding Its Title VII Claim To The Case

On December 26, 2024, the EEOC issued a right-to-sue letter that allowed FASORP to bring its Title VII claim against Northwestern. App. 146. Upon receiving the right-to-sue letter, FASORP sought to add its Title VII claim to the lawsuit in the least expensive and least time-consuming manner. There were three possible ways for FASORP to accomplish this:

1. Amend the complaint under Rule 15(a)(2) by obtaining leave of court or Northwestern's written consent;

2. Dismiss its action without prejudice under Rule 41(a)(1) and file a new lawsuit against Northwestern that includes the Title VII claim; or

3. File a separate Title VII lawsuit against Northwestern and move to consolidate the newly filed action into the previously filed action under Rule 42(a)(2).

In most situations, Option (1) presents the easiest and least costly way to add a new claim to an already-filed lawsuit. The standard for obtaining leave to amend is gen-

erous,[20] and the process for obtaining leave to amend typically requires nothing more than a short motion that the district court decides on the papers.

In some situations, however, Option (2) will impose the fewest burdens on the parties and the court. A plaintiff that unilaterally dismisses and refiles will save the parties and the court the time and expense of litigating a contested motion for leave to amend. And sometimes those savings will exceed the marginal costs that a dismissal-and-refiling will impose on the litigants. A plaintiff that dismisses and refiles must pay an additional filing fee of $405.00, and both sides must pay another round of pro hac vice admission fees for each attorney that is not admitted to practice in the Northern District of Illinois. But these out-of-pocket costs amount to only hundreds of dollars, while the costs of litigating a contested motion for leave to amend will run into the tens of thousands of dollars—especially when a court decides to hold an in-person hearing on the motion that compels the attorneys on both sides to travel halfway across the country.

FASORP's attorney initially believed that Option (1) presented the most straightforward and least costly way of adding his Title VII claim to the case, and he expected the district court to grant the motion for leave to amend quickly and without holding an in-person hearing. App. 66 (¶ 20). On January 14, 2025, however, the district court notified the parties during a telephone conference that it intended to hold an in-person hearing on the motion for leave to amend, and it scheduled that hearing for February 5, 2025. App. 182–183 ("I'd like to see you in person because I may want argument on this."). But the district court also indicated that it might decide the motion for leave to amend on the papers and cancel the in-person hearing. App. 183 ("[I]f I decide I'm just going to rule on the papers, I'll let you know ahead of the 5th."). At this point, Mr. Mitchell began to consider whether

20. *See* Fed. R. Civ. P. 15(a)(2) (instructing courts to "freely give leave" to amend "when justice so requires.").

Option (2) would provide a more convenient and less costly means of adding the Title VII claim to the case, as a trip to Chicago for an in-person hearing would cost the litigants tens of thousands of dollars in fees and travel-related costs. App. 66 (¶ 21). Mr. Mitchell was also eager to avoid the need for an in-person hearing in Chicago because a member of his immediate family was suffering from a medical issue in early 2025 that would be aggravated if he were to take a two-day business trip to Chicago on February 4–5, 2026. App. 61–62 (¶¶ 7–9). Mr. Mitchell began making backup plans in case the district court denied the motion for leave to amend, and Mr. Mitchell decided that he would dismiss under Rule 41(a) and refile if the Court denied his motion for leave to amend. App. 64–65 (¶¶ 16–17).

Because the motion for leave to amend had already been briefed, Mr. Mitchell decided to wait and see if the Court would rule on the papers without the need for an in-person hearing. App. 66 (¶ 21). But when Judge Ellis's courtroom deputy informed Mr. Mitchell on January 28, 2025, that the Court would proceed with the in-person hearing, Mr. Mitchell decided, after conferring with others, that dismissing and refiling presented the most convenient and efficient way of adding the Title VII claim to the lawsuit, and that it would impose the least amount of costs on his client, his family, his opposing litigants, his opposing counsel, and the district court. App. 66–67 (¶¶ 21–22).

**Costs imposed on Mr. Mitchell's client**: Proceeding with the in-person hearing in Chicago would have cost Mr. Mitchell's client approximately $10,000.00 in attorneys' fees and travel costs. App. 60–61 (¶ 5). Dismissing and refiling would cost Mr. Mitchell's client only $1,155.00 in additional fees—a second filing fee of $405.00 and a second round of $150 pro hac vice fees for each of the five attorneys on the complaint who are not admitted to practice in the Northern District of Illinois. Rule 41(d) would also allow the defendants to seek recovery of their "costs" in No. 24-5558 from Mr. Mitchell's client. *See* Fed. R. Civ. P. 41(d). But the term

"costs" excludes attorneys' fees as well as fees for pro hac vice admission, so these "costs" would be minimal (if not zero). *See Esposito*, 223 F.3d at 500–02 ("Rule 41(d) … does not refer to attorneys' fees as an awardable cost."); *Canter v. AT&T Umbrella Benefit Plan No. 3*, 33 F.4th 949, 959 (7th Cir. 2022) ("*[P]ro hac vice* fees are not taxable 'costs'").

**Costs imposed on the defendants**: Dismissing and refiling would obviate the need for the defendants to fly a team of D.C.-based attorneys to Chicago for an in-person hearing on the motion for leave to amend. Mr. Mitchell estimated that these cost savings would amount to tens of thousands of dollars. App. 61 (¶ 6). Latham & Watkins is an elite law firm and its attorneys bill at high hourly rates. The travel costs alone would amount to thousands of dollars, as the defendants would be paying for airfare, hotels, meals, and Ubers for each attorney attending the hearing, and law firms such as Latham & Watkins typically charge their clients for attorneys' travel time as well.

Mr. Mitchell recognized that dismissing and refiling would require the defendants to pay another round of pro hac vice admissions fees, and for attorney time needed to convert their previously filed motion to dismiss in No. 24-5558 into a motion to dismiss the newly filed complaint in No. 25-1189. But Mr. Mitchell could not imagine a scenario in which those costs and fees would not be offset by the money saved from canceling the in-person hearing in Chicago. App. 61 (¶ 6).

**Costs imposed on the district court**: Dismissing and refiling would save the district court time by obviating the need for a ruling or in-person hearing on the contested motion for leave to amend. Mr. Mitchell expected that a dismissal and refiling would allow the parties to pick up where they left off in No. 24-5558, and that the defendants would quickly and easily convert their previously filed motion to dismiss in No. 24-5558 into a motion to dismiss the complaint in No. 25-1129. If the district court had denied the motion for leave to amend after holding an in-

person hearing, then Mr. Mitchell would have dismissed and refiled to add his Title VII claim. App. 64 (¶ 16). And if the district court had granted the motion for leave to amend after holding an in-person hearing, then the parties would be in the same situation that they would have been in if Mr. Mitchell had dismissed and refiled before the hearing. Mr. Mitchell therefore believed that a dismissal and refiling would save time and money for all parties involved given the Court's insistence on holding an in-person hearing on the motion for leave to amend.

Mr. Mitchell also researched the law before dismissing and refiling and consulted with one of his most trusted friends who is an experienced and highly successful trial attorney. App. 67 (¶ 23). Mr. Mitchell's friend assured him that dismissing and refiling is an acceptable and ethical method for amending a pleading before the other side has filed its answer, but he warned Mr. Mitchell to avoid any appearance of judge shopping and to mark on the civil cover sheet that the case had been previously filed and assigned to Judge Ellis. *Id.* Mr. Mitchell also researched the Seventh Circuit's case law on Rule 41(d). App. 68 (¶ 25). He read *Esposito v. Piatrowski*, 223 F.3d 497 (7th Cir. 2000), which holds that the reference to "costs" in Rule 41(d)(1) excludes attorneys' fees, and that attorneys' fees cannot be recovered under Rule 41(d) unless the original filing in No. 24-5558 was "frivolous, unreasonable, or groundless." *Id.* at 500–02 (citation omitted). And he read *Sanderson v. Spectrum Labs, Inc.*, 248 F.3d 1159 (7th Cir. 2000), which allows district courts to order payment of fees when a litigant has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at *6 (citation omitted). Mr. Mitchell knew that the dismissal and refiling was not being done "in bad faith, vexatiously, wantonly, or for oppressive reasons," as his sole motivations for dismissing and refiling were to save both sides the time and expense of an in-person hearing in Chicago and to avoid the need to travel when one of his immediate family members was suffering with a medical issue. App. 68 (¶ 25).

### B. FASORP Offered To Pay Northwestern's Court Costs in No. 24-5558 Before Northwestern Filed Its Rule 41(d) Motion

On March 24, 2025, Mr. Mitchell conferred with Jude Volek, counsel for the defendants, by videoconference for over 30 minutes. App. 60 (¶ 4). During this conference, Mr. Mitchell explained in detail why he decided to dismiss the action under Rule 41(a)(1)(A)(i) and refile, rather than proceed with the in-person hearing on the motion for leave to amend that the Court had scheduled for February 5, 2025. *Id*. Mr. Volek did not contest the veracity of Mr. Mitchell's stated motivations for dismissing and refiling during the meet-and-confer session. App. 62 (¶ 10). Mr. Mitchell told Mr. Volek that he would willingly pay any court costs that the defendants had incurred in No. 24-5558. App. 62–63 (¶ 11).

Mr. Mitchell also told Mr. Volek that if he was wrong in believing that his decision to dismiss and refile would save the defendants money, then Mr. Volek should send documentation of the costs and fees that the defendants were compelled to incur on account of the dismissal-and-refile maneuver. App. 62–63 (¶ 11). Mr. Mitchell told Mr. Volek that if those costs and fees were reasonably incurred and exceed what Mr. Mitchell regards as a reasonable estimate of fees and travel costs that he saved the defendants by obviating the need for an in-person hearing in Chicago, then Mr. Mitchell would willingly pay the difference. *Id*. Neither Mr. Volek nor his co-counsel sent any such documentation to Mr. Mitchell in response to this invitation. *Id*.; App. 42–43 n.2. Instead, the defendants filed a Rule 41(d) motion demanding that FASORP pay all of the attorneys' fees that they the defendants had incurred in No. 24-5558. *Id*. The district court denied Northwestern's request to recover its attorneys' fees in No. 24-5558, yet it ordered FASORP to pay $60,000.00 to Northwestern for the time spent preparing the Rule 41(d) motion. App. 36–44.

### C. The District Court Abused Its Discretion By Ordering FASORP To Pay Northwestern's Fees For The Time It Spent Preparing Its Rule 41(d) Motion

There are only two circumstances that would allow a court to order FASORP to pay attorneys' fees in response to the dismissal and refiling. First, a court may award Northwestern attorneys' fees under 42 U.S.C. § 1988 if FASORP's previously filed action was "frivolous, unreasonable, or groundless." *Esposito*, 223 F.3d at 501 (citing *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 424 (1978)). Second, a court may order FASORP to pay attorneys' fees if the dismissal and refiling was done "in bad faith, vexatiously, wantonly, or for oppressive reasons," as courts possess inherent powers to sanction litigants who engage in nefarious or malevolent tactics. *Sanderson*, 248 F.3d at 1159 (quoting *F.D. Rich Co., Inc. v. United States ex rel. Industrial Lumber Co., Inc.*, 417 U.S. 116, 129 (1974)); *United States for Use and Benefit of Treat Brothers Co. v. Fidelity and Deposit Co. of Maryland*, 986 F.2d 1110, 1120 (7th Cir. 1993) (recognizing "district courts' inherent power to sanction abusive and egregious behavior by a litigant by awarding attorneys' fees."). Neither of these standards is even remotely satisfied.

#### 1. The District Court Abused Its Discretion By Holding That FASORP's Counsel Acted In Bad Faith By Dismissing And Refiling The Lawsuit

The district court relied only on the second ground, claiming that fee shifting was warranted because it was "not convinced" that FASORP's dismissal and refiling "was not frivolous, unreasonable, or done in bad faith." App. 43. But the burden of proof is on Northwestern to show that FASORP's attorney acted in a frivolous, unreasonable, or bad-faith manner; it is not FASORP's burden to "convince" the district court that sanctions are unwarranted. *See Bracey v. Grondin*, 712 F.3d 1012, 1019 (7th Cir. 2013) (burden of proof rests with the party seeking sanctions). Then the district court explained its decision as follows:

> [T]he Court … does not fully comprehend FASORP's litigation tactics, particularly given that the Court planned to allow FASORP leave to amend in the 2024 case to add the Title VII claim. In other words, although FASORP denies that it undertook the procedural maneuver of dismissal and refiling to avoid an adverse ruling, had that been FASORP's motivation, the actions that prompted this Rule 41(d) motion would have been for naught. But FASORP represents that they were not because, by dismissing and refiling, it avoided an in-person hearing, which saved all parties time and money, and also served FASORP's counsel's personal interests. While the Court does not know the monetary costs the parties would have incurred in connection with the February 5, 2025 scheduled in-person hearing in the 2024 case, the Court agrees with Defendants that in seeking to avoid that hearing, FASORP's unilateral action needlessly delayed the case and inflicted additional costs on Defendants. *See Mach v. Will Cnty. Sheriff*, 580 F.3d 495 (7th Cir. 2009) (bad faith includes "harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, and recklessly making a frivolous claim" and can "be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation" (citations omitted)). Therefore, the Court finds it appropriate to award Defendants attorneys' fees pursuant to Rule 41(d).

App. 43.

The district court cannot credibly claim that it "does not fully comprehend FASORP's litigation tactics," as Mr. Mitchell clearly and unambiguously explained his reasons for dismissing and refiling in a declaration filed under penalty of perjury. App. 60–62. His first reason was that dismissing and refiling would save both sides time and money by obviating the need to travel to Chicago for an in-person hearing on the contested motion for leave to amend. App. 60–61 (¶¶ 5–6). His second reason for dismissing and refiling was that one of his immediate family members was dealing with a medical issue in early 2025 and needed Mr. Mitchell at home. App. 61–62 (¶¶ 7–9). Mr. Mitchell insisted that these were his "*only* motivations for dismissing and refiling before the hearing." App. 64 (¶ 15) (emphasis added). Neither the district court nor defendants claim that Mr. Mitchell is lying in his declaration, and there is nothing in this declaration that should leave the district court (or any-

one else) unable to "comprehend" why FASORP decided to dismiss and refile rather than continue litigating its motion for leave to amend.

More importantly, the district court cannot pronounce FASORP guilty of bad faith while simultaneously claiming an inability to comprehend FASORP's litigation tactics. If the district court "does not fully comprehend"[21] FASORP's reasons for dismissing and refiling, then Northwestern has failed to prove bad faith on the part of FASORP's counsel. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) (a court must "determin[e] that the requisite bad faith exists" before assessing fees). Courts are not permitted to presume bad faith, and this Court has held many times that bad faith is a "stringent"[22] standard and that courts may not lightly impugn the motivations of attorneys. *See Federal Deposit Insurance Corp. v. Tekfen Construction and Installation Co.*, 847 F.2d 440, 444 (7th Cir. 1988) ("A lawyer's reputation for integrity, thoroughness and competence is his or her bread and butter. We may not impugn that reputation without carefully analyzing the legal and factual sufficiency of the arguments.").

Finally, the district court's only reason for finding bad faith rests on its assertion that FASORP's dismissal and refiling "needlessly delayed the case and inflicted additional costs on Defendants." App. 43. Even if this were true (and it isn't), that comes nowhere close to establishing bad faith on the part of FASORP. The mere fact that FASORP's dismissal and refiling "delayed the case" and "inflicted addition-

21. App. 43.

22. *See Badillo v. Central Steel & Wire Co.*, 717 F.2d 1160, 1165 (7th Cir. 1983) ("[T]he standard of bad faith awards is quite stringent and such an award is appropriate only if the trial court finds both that the litigant who filed the claim or motion acted in subjective bad faith, and that the claim or motion was unsupported by probable cause." (citation and internal quotation marks omitted)); *Adams v. Carlson*, 521 F.2d 168, 170 (7th Cir. 1975) ("The standards for bad faith are necessarily stringent."); *Satoskar v. Indiana Real Estate Commission*, 517 F.2d 696, 698 (7th Cir. 1975) (same).

al costs on Northwestern" does not show bad faith unless FASORP acted recklessly or with the knowledge or intent that its dismissal-and-refiling maneuver would produce those results. *See In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985) ("[A] lawyer engages in bad faith by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law."); *id.* at 446 ("When an attorney recklessly creates needless costs the other side is entitled to relief."). The district court made no finding that FASORP's counsel acted recklessly or even negligently by dismissing and refiling. And it did not deny the reasonableness of FASORP's counsel's beliefs that dismissing and refiling would save both sides time and money by eliminating the need to travel to Chicago for an in-person hearing on the contested motion for leave to amend, and that those savings would far exceed any costs that might inflicted by the dismissal-and-refile maneuver. App. 60–61.

Instead, the district court claimed that the mere fact that FASORP's maneuvers produced "delay" and "costs" showed that FASORP acted in "bad faith," without regard to whether FASORP acted recklessly or even negligently. The district court cited *Mach v. Will County Sheriff*, 580 F.3d 495 (7th Cir. 2009), to support this idea,[23] but the district court in that case "expressly determined that Mach *knew* that five of the six bases for his claims were 'worthless' and 'non-starters.'" *Id.* at 501. *Mach* does not hold or even imply that a tactic that merely results in "delay" or "costs" can be sanctioned as an act of "bad faith"—without any finding or determination that counsel acted recklessly or with the knowledge or intent that dismissal and refiling would impose unwarranted delay or costs. Bad faith is not a strict-liability standard, and the district court's decision to find bad faith based solely on its assessment that dismissal and refiling resulted in "delay" or "costs" is an error of law and a *per se* abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384,

23. App. 43.

405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law").

The district court also had no basis for claiming that FASORP's dismissal and refiling "delayed" the case and imposed "additional costs" on Northwestern. App. 43. FASORP had no way of knowing whether or when the district court would grant or deny its motion for leave to amend, so dismissing and refiling allowed the new complaint to take effect immediately on February 1, 2025. App. 83. If FASORP had continued litigating its motion for leave to amend, it would have had to wait for the district court to rule on the motion before amending its pleading, and this would not have occurred before the in-person hearing scheduled for February 5, 2025. And the district court might have denied the motion for leave to amend, which would have compelled FASORP to dismiss and refile after waiting for the district court to rule. Dismissing and refiling allowed the amended complaint to immediately become the operative pleading on February 1, 2025, and it avoided any need for the parties to wait for the in-person hearing and the district court's eventual ruling on the contested motion.

The district court said that it "does not know the monetary costs the parties would have incurred in connection with the February 5, 2025 scheduled in-person hearing." App. 43. So how can the district court simultaneously assert that FASORP "inflicted additional costs" on Northwestern by dismissing and refiling? FASORP saved Northwestern tens of thousands of dollars in attorneys' fees and travel costs by avoiding the need for an in-person hearing on the motion for leave to amend, in which a team of attorneys from Latham & Watkins's D.C. office would have had to fly to Chicago and prepare for the hearing. App. 61 (¶ 6). The district did not attempt to determine whether these undeniable cost savings exceeded the "additional costs" imposed on Northwestern by the dismissal and refiling—which the district court did not bother to identify, let alone quantify. And Northwestern did not even

argue in the district court that the "costs" it incurred on account of the dismissal and refiling exceeded the time and money saved by forgoing the in-person hearing in Chicago. *See Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 119 (7th Cir. 1994) (holding that attorneys "should not be penalized for a course of conduct that, if successful, could have led to substantial savings of time and expense.").

#### 2. The District Court Abused Its Discretion By Ordering FASORP To Pay Fees For The Time Northwestern Spent Preparing Its Rule 41(d) Motion After Ruling That Rule 41(d) Did Not Allow Northwestern To Recover Any Fees For Work Performed In No. 24-5558

After ruling that FASORP had acted in "bad faith" by dismissing and refiling, the district court correctly held that Northwestern could not recover fees under Rule 41(d) for any of the time it spent litigating No. 24-5558. App. 43–44; *Rogers v. Wal-Mart Stores, Inc.*, 230 F.3d 868, 874 (6th Cir. 2000) ("[A]ttorney fees are not available under Rule 41(d)."). Yet the district court nonetheless required FASORP to "pay Defendants the fees they have incurred in bringing this Rule 41(d) motion." App. 44. The district court had no authority to award those fees.

Rule 41(d) allows a court to "order the plaintiff to pay all or part of the costs *of that previous action*." Fed. R. Civ. P. 41(d) (emphasis added). Even if one disregards the holding of *Esposito* and construes the word "costs" to include attorneys' fees,[24] those fees can be awarded only for work performed in the "previous action." Northwestern's Rule 41(d) motion was prepared and filed in the current action, so it is not eligible for fee-shifting under Rule 41(d).

It is also absurd to compel FASORP to pay attorneys' fees for the time that Northwestern spent on an unsuccessful Rule 41(d) motion. The district court agreed with FASORP that Northwestern could not recover attorneys' fees under Rule 41(d) for any of the work performed in No. 24-5558. App. 43–44. So how

24. *See Esposito*, 223 F.3d at 500–02.

can the district court justify putting FASORP on the hook for the fees that Northwestern incurred in preparing this bootless request? The entire Rule 41(d) motion was a waste of time, as FASORP had already told Northwestern that it would willingly pay the "costs" incurred in No. 24-5558, but that it would not include attorneys' fees as part of those "costs" given the holding of *Esposito*. App. 42 ("FASORP has agreed to pay the court costs that Defendants incurred in the 2024 case"); App. 62. And when Northwestern insisted on litigating this dispute, the district court vindicated FASORP's position and held that FASORP needed to pay only costs and not the attorneys' fees that Northwestern incurred in No. 24-5558. App. 43–44.

So the district court held that FASORP was right to refuse Northwestern's demands for attorneys' fees in No. 24-5558—yet it simultaneously held that FASORP must pay Northwestern's attorneys' fees for the time spent briefing and litigating an argument that the district court rejected. That is nonsensical. The district court's decision to reject Northwestern's demands for attorneys' fees in No. 24-5558 is unassailable given the holding of *Esposito*, and Northwestern has not appealed the district court's ruling. So Northwestern should bear the fees that it incurred in making this unsuccessful request.

## CONCLUSION

The judgment of the district court and the award of attorney's fees should be vacated, and the case remanded for further proceedings.

Respectfully submitted.


/s/ Jonathan F. Mitchell

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

GENE P. HAMILTON
RYAN GIANNETTI
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org
ryan.giannetti@aflegal.org


Dated: May 1, 2026

*Counsel for Plaintiff-Appellant FASORP*

## CERTIFICATE OF SERVICE

I certify that on May 1, 2026, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Seventh Circuit and served through CM/ECF upon:


Danielle Conley
Jude Volek
Dunn Isaacson Rhee LLP
401 9th Street NW
Washington, D.C. 20004
(202)-240-2900 (phone)
dconley@dirllp.com
jvolek@dirllp.com

Christine C. Smith
Jasmine D. Benjamin
Latham & Watkins LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
(202) 637-2200 (phone)
(202) 637-2201 (fax)
christine.smith@lw.com
jasmine.benjamin@lw.com

Sean Berkowitz
Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611-3695
(312) 876-7700 (phone)
(312) 993-9767 (fax)
sean.berkowitz@lw.com


*Counsel for Defendants-Appellees*

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Plaintiff-Appellant FASORP*

## CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements, and type-style requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by Seventh Circuit Rule 32(c), because it contains 13,999 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as modified by Seventh Circuit Rule 32(b), because it uses ITC Galliard Pro 12-point type face throughout, and ITC Galliard Pro is a proportionally spaced typeface that includes serifs.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff-Appellant FASORP*

Dated: May 1, 2026

## CIRCUIT RULE 30(d) STATEMENT

I certify that all material required by Circuit Rule 30(a) and (b) are included in the appendix. I also certify that all material required by Circuit Rule 30(a) are included in the required short appendix attached to this brief.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Plaintiff-Appellant FASORP*

Dated: May 1, 2026

## REQUIRED SHORT APPENDIX TABLE OF CONTENTS

Judgment (ECF No. 54) .................................................................. Short App. 1

Opinion and Order Granting Motion to Dismiss (ECF No. 52) ........... Short App. 2

Order Awarding Defendants' $60,000.00 (ECF No. 47) .................... Short App. 34

Order Awarding Defendants' Fees Incurred in Preparing and
Filing Their Rule 41(d) Motion (ECF No. 23) .................................. Short App. 35

**IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS**

Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP),
Plaintiff,

v.
Northwestern University et al,

Defendant,

Case No. 25 C 1129

Judge Sara L. Ellis

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff
and against defendants

which ☐ includes pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.
Plaintiff shall recover costs from defendants.

---

☐ in favor of defendant
and against plaintiff

Defendant shall recover costs from plaintiff.

---

☒ other: As indicated on the record, Plaintiff has no plans to file an Amended Complaint. Civil case terminated.

---

This action was *(check one)*:

☐ tried by a jury with Judge presiding, and the jury has rendered a verdict.
☐ tried by Judge without a jury and the above decision was reached.
☒ decided by Judge Sara L. Ellis on 2/11/2026.

Date: 2/13/2026

Thomas G. Bruton, Clerk of Court

Jannette Nunez, Deputy Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES, | ) | |
| Plaintiff, | ) | No. 25 C 1129 |
| v. | ) | Judge Sara L. Ellis |
| NORTHWESTERN UNIVERSITY, *et al.*, | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff Faculty, Alumni, and Students Opposed to Racial Preferences ("FASORP") is a "voluntary, unincorporated, non-profit membership organization formed for the purpose of restoring meritocracy in academia and fighting race and sex preferences that subordinate academic merit to so-called diversity considerations." Doc. 1 ¶ 3. On February 1, 2025, FASORP filed this lawsuit against Defendants Hari M. Osofsky, the dean of Northwestern University School of Law ("Northwestern Law"); Sarah Lawsky, a professor at Northwestern Law; Janice Nadler, a professor at Northwestern Law; Daniel Rodriguez, a professor and former dean at Northwestern Law; Dheven Unni, the editor in chief of Northwestern University Law Review ("NLR"); Jazmyne Denman, the senior equity and inclusion editor of NLR (collectively, the "Individual Defendants"); and Northwestern University. FASORP alleges that Defendants discriminate against heterosexual, cisgender white men during Northwestern Law's entry-level and lateral faculty hiring processes and NLR's selection of members, editors, and articles. FASORP asserts claims for (1) violations of Title VI (42 U.S.C. § 2000d); (2) violations of Title

IX (20 U.S.C. § 1681(a)); (3) violations of 42 U.S.C. § 1981; and (4) violations of Title VII (42 U.S.C. § 2000e-2).[1]

Defendants now move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The Court holds that, because FASORP has failed to identify any members who would have standing in their own right to challenge Northwestern Law's entry-level faculty hiring process or NLR's selection of members, editors, and articles, FASORP does not have associational standing to challenge these processes. Additionally, although FASORP seeks injunctive relief regarding Northwestern Law's faculty promotion, retention, and compensation policies or practices, FASORP does not allege that any of its members have standing to challenge these processes. The Court therefore dismisses FASORP's claims to the extent that they challenge these processes.

With respect to Northwestern Law's lateral faculty hiring process, the Court concludes that FASORP has failed to state any cognizable, facially plausible claims. Starting with the Title VI claim, Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid. Because FASORP has failed to plausibly allege that either of these exceptions apply here, the Court dismisses the Title VI lateral faculty hiring claim. Further, in light of FASORP's concession that its Title IX hiring claim cannot proceed given the holding of *Waid v. Merrill Area Public Schools*, 91 F.3d 857, 861–63 (7th Cir. 1996), the Court dismisses the Title IX lateral faculty hiring claim. Finally, the Title VII and Section

[1] In 2024, FASORP filed a similar case challenging Northwestern Law's entry-level and lateral faculty hiring processes and NLR's selection of members, editors, and articles. *FASORP v. Northwestern Univ., et al.,* No. 24-cv-5558 (N.D. Ill.) (the "2024 Case"). After the defendants filed a motion to dismiss, FASORP requested leave to amend its complaint and add a Title VII claim. Before the Court could rule on either motion, FASORP voluntarily dismissed the 2024 Case and filed the instant complaint.

1981 claims both require FASORP to plausibly allege that Defendants instituted a specific adverse employment action against at least one of its members, yet FASORP alleges only that its members will face a competitive disadvantage during the hiring process. And FASORP does not dispute that it failed to allege but-for causation, another requirement for the Section 1981 claim. The Court therefore dismisses the Title VII and Section 1981 lateral faculty hiring claims.

## BACKGROUND[2]

### I. Faculty Hiring at Northwestern Law

#### A. General Overview of Hiring Processes

Northwestern Law utilizes two different processes for faculty hiring, depending on whether the applicant already holds a law school faculty appointment elsewhere. Entry-level applicants submit applications through the "Faculty Appointments Register," whereas lateral candidates "do not submit documents or go through a formalized process." Doc. 1 ¶ 113. Instead, lateral candidates "inform friends or acquaintances on the faculty of their interest in seeking a position." *Id.* This is because "[t]he most common form of lateral recruiting is driven not by the interested prospective lateral but by the recruiting school" and lateral candidates "generate interest from a school" by "convinc[ing] intermediaries to convince the appointments committee to recruit him." *Id.*

The allegations in the complaint provide very few details about the process by which Northwestern Law evaluates these candidates, however. The complaint briefly discusses an

[2] The Court takes the facts in the background section from FASORP's complaint and exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). The Court "may also take judicial notice of matters of public record." *Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1043–44 (7th Cir. 2019).

appointments committee, which "has complete control over which candidates will be brought in for interviews or voted upon by the faculty." *Id.* ¶ 45. The complaint suggests that there may be separate appointment committees for lateral and entry-level applicants. *See id.* ¶ 38 (discussing "lateral-appointments committee"). The dean of Northwestern Law chooses the committee members on an annual basis "with no formal input from the faculty." *Id.* The complaint does not explain the interview or voting processes with any level of specificity.

**B. Alleged Discrimination**

FASORP alleges that, over the last twelve years, the leadership of Northwestern Law has implemented and enforced a discriminatory "hiring mandate" to "intentionally and consciously discriminate in favor of black, Hispanic, Asian, female, homosexual, and transgender faculty candidates, and against white men who are heterosexual and non-transgender." *Id.* ¶ 12. This mandate allegedly resulted in Northwestern Law "refus[ing] to even consider hiring white male faculty candidates with stellar credentials, while it eagerly hires candidates with mediocre and undistinguished records who check the proper diversity boxes." *Id.* ¶ 14. FASORP further alleges that Northwestern Law "doubled down on its racial preferences for black faculty candidates after the death of George Floyd in 2020, in response to pressure from students who complained that black faculty were insufficiently represented." *Id.* ¶ 40. On June 12, 2020, the dean of Northwestern Law issued a letter discussing the school's "Commitment to Anti-Racism," writing:

> Hiring more Black faculty and faculty of color—and retaining and promoting those faculty members—is a top priority for me. We need to build a faculty that is reflective of our student body and the Law School's diverse ideals. I am pleased that both of our faculty hires this past year, Paul Gowder, who will join our tenure-line faculty, and Robin Walker Sterling, who will join our faculty as the Mayer Brown/Robert A. Helman Professor of Law and director of the Bluhm Legal Clinic, will help further this goal. This is only

> a start. In addition to recruiting diverse full-time hires, we will prioritize this through visiting faculty and adjunct hires.

*Id.* ¶ 41 (citing Doc. 1-4 at 2).

According to FASORP, the appointments committee perpetuates this "regime of illegal race and sex preferences." *Id.* ¶ 45. The deans allegedly "ensure that faculty members who are known to oppose discriminatory race and sex preferences are never selected for the appointments committee." *Id.* As a result, the appointments committee "makes sure that white men are blocked from further consideration at the committee stage, so that the faculty has no chance to vote on them." *Id.* ¶ 46. At the same time, however, FASORP alleges that the appointments committee "of course . . . will occasionally allow some white men to proceed to the interview stage, because if the committee never allowed any white men to interview then that would create a strong inference of discriminatory motive." *Id.* ¶ 47. And of those who proceed to the interview stage, FASORP alleges that "white men . . . are never hired unless they are in a high-demand and low-supply field (such as tax or empirical work), where it is difficult or impossible to find female or minority scholars." *Id.*

FASORP provides examples of Northwestern Law leadership allegedly perpetuating this discrimination in various ways. To start, they discuss three candidates whom Northwestern Law allegedly refused to consider for faculty appointments. Eugene Volokh "is a prolific and internationally renowned legal scholar" who allegedly expressed interest in a faculty appointment at Northwestern Law during the 2022–2023 academic year. *Id.* ¶ 15. Although many members of Northwestern Law's faculty supported Volokh's appointment, Defendant Rodriguez allegedly "refused to even invite Professor Volokh to interview" because he "is a white man, and he is neither homosexual nor transgender." *Id.* ¶¶ 15–17. Similarly, FASORP alleges that the appointments committee recommended Ilan Wurman for a tenure-track

appointment during the 2019–2020 hiring cycle, but Defendant Lawsky "expressly stated at a faculty meeting that she opposed Wurman's appointment to the faculty because he is a white man." *Id.* ¶ 20. Two other professors, including Defendant Nadler, also allegedly opposed Wurman's appointment because they wanted "to hire women and nonwhites rather than white men." *Id.* Finally, FASORP alleges that Ernie Young is "another famous and distinguished legal scholar whom Northwestern refused to hire because he is a white man." *Id.* ¶ 18. The complaint does not include any allegations regarding when or how he applied for a faculty appointment at Northwestern Law.

FASORP also alleges that Northwestern Law's discriminatory "hiring mandate has led to the hiring of patently unqualified professors." *Id.* ¶ 21. First, it alleges that Destiny Peery was "unqualified for an academic appointment and incapable of producing serious scholarship," *id.*, but she nevertheless was hired in 2014 as a tenure-track professor. According to FASORP, Defendant Rodriguez "threatened to withhold bonuses from any faculty member who would vote against Peery or attempt to thwart her appointment." *Id.* ¶ 22. Further, FASORP states that "Peery was hired because she is a black female, as numerous faculty members explicitly stated when discussing her candidacy." *Id.* ¶ 23. Second, in 2015, Northwestern Law hired Candice Player, who FASORP describes as "another unqualified black woman." *Id.* ¶ 34. According to FASORP, Defendant Rodriguez again "ramrodded Player's appointment through the faculty by threatening to withhold bonuses from any professor who had the temerity to question the wisdom or legality of the appointment." *Id.* ¶ 36. Player was allegedly "hired over white male candidates who were vastly more capable and qualified than she was." *Id.* Third, during the 2019–2020 academic year, Defendant Yuracko wanted to hire Paul Gowder and Heidi Kitrosser. FASORP alleges that she "offered a bargain" to Professor Calabresi, a conservative member of

the lateral-appointments committee. *Id.* ¶ 38. Defendant Yuracko allegedly "told Calabresi that if he would support the lateral appointments of Gowder and Kitrosser . . . then Yuracko would support an entry-level appointment for Ilan Wurman, a Federalist Society member supported by Professor Calabresi." *Id.* Defendants Yuracko and Lawsky allegedly then "torpedoed" the appointment of Wurman, because they "did not want a white male." *Id.* ¶ 39. Fourth, Northwestern Law hired Jamelia Morgan, a black woman, as a professor in 2022, even though she was "only in her fourth year of teaching, barely tenured," and "had no competing offers from any schools ranked higher than Northwestern." *Id.* ¶ 42. Finally, Northwestern Law extended an offer in 2024 to Myriam Gilles, "a black law professor at Cardozo Law School." *Id.* ¶ 44. According to FASORP, "[i]t was made clear to the Northwestern faculty that the law school had to hire a black woman for this position, and that if they did not vote to approve the appointment of Gilles then the law school would have to hire a black woman later who would almost certainly be worse." *Id.* FASORP also alleges that Northwestern Law hired Gilles despite her past plagiarism.

The complaint also provides data regarding "how Northwestern has conducted its interviews and hiring decisions over the last three academic years." *Id.* ¶ 48. In particular, they identify the number of candidates who received interviews and/or offers during each hiring cycle and compare the number of offers provided to white men with offers made to anyone other than white men. They allege that Northwestern Law gave offers to (1) six candidates during the 2023–2024 hiring cycle, none of whom were white men; (2) nine candidates during the 2022–2023 cycle, one of whom was a white man; and (3) six candidates during the 2021–2022 cycle, two of whom were white men.[3] To more clearly illustrate this data, Tables 1 and 2 further

[3] FASORP alleges that Northwestern Law gave offers to two of these white men because their expertise is in fields where "it is very difficult to find female or minority scholars." Doc. 1 ¶¶ 49–50. FASORP

compare the number of candidates who received interviews and/or offers during each hiring cycle:

**Table 1. Race/Ethnicity of Candidates**

| | White | Black | Asian | Latino/ Hispanic | Not Specified |
|---|---|---|---|---|---|
| **2023–2024 Hiring Cycle** | | | | | |
| **Interviewed** | 4 | 4 | 3 | 1 | 4 |
| **Offer Made** | 1 | 2 | 1 | 0 | 2 |
| **2022–2023 Hiring Cycle** | | | | | |
| **Interviewed** | 12 | 3 | 4 | 2 | 0 |
| **Offer Made** | 5 | 1 | 2 | 1 | 0 |
| **2021–2022 Hiring Cycle** | | | | | |
| **Interviewed** | 7 | 7 | 2 | 1 | 0 |
| **Offer Made** | 4 | 1 | 1 | 0 | 0 |
| **Total** | | | | | |
| **Interviewed** | 23 | 14 | 9 | 4 | 4 |
| **Offer Made** | 10 | 4 | 4 | 1 | 2 |

**Table 2. Sex/Gender of Candidates**

| | Male | Female | Non-Binary |
|---|---|---|---|
| **2023–2024 Hiring Cycle** | | | |
| **Interviewed** | 8 | 7 | 1 |
| **Offer Made** | 2 | 3 | 1 |
| **2022–2023 Hiring Cycle** | | | |
| **Interviewed** | 11 | 10 | 0 |
| **Offer Made** | 4 | 5 | 0 |
| **2021–2022 Hiring Cycle** | | | |
| **Interviewed** | 6 | 11 | 0 |
| **Offer Made** | 2 | 4 | 0 |
| **Total** | | | |
| **Interviewed** | 25 | 28 | 1 |
| **Offer Made** | 8 | 12 | 1 |

further alleges that the offer given to the other white man "was a sham" because the candidate had already received another offer from the University of Chicago and there was "zero chance" that the candidate would accept Northwestern Law's offer. Northwestern Law allegedly "extended him an offer for the sole purpose of making their policy of discriminating against white men seem somewhat less obvious to someone who simply examines the numbers." *Id.* ¶ 49.

## II. Northwestern Law Review

### A. General Overview of Member, Editor, and Article Selection Process

The complaint includes very few details about NLR's member, editor, and article selection processes. With respect to NLR's member and editor selection process, NLR allegedly solicits personal statements from student applicants "[r]ather than choosing its members based on law-school grades and a blind-graded writing competition." *Id.* ¶ 82. FASORP alleges that "[s]tudents are encouraged to use these personal statements to signal their race, sexual orientation, and gender identity," *id.*, but the complaint is silent as to who encourages students to disclose this information and whether the students actually disclose this information. FASORP further alleges that, "a student applicant who is female, a racial minority, or homosexual or transgender and who uses those demographic characteristics to claim that they have overcome adversity or will bring a unique perspective to the law review will be awarded a significant boost in the membership-selection process," whereas "a white male applicant who is neither homosexual nor transgender will never be awarded any type of preference based on their personal statement, even if they claim to have overcome adversity or assert that they will bring a unique perspective to the law review." *Id.* ¶ 83.

The allegations regarding the article selection process are even more sparse. The complaint alleges that there is a "normal selection process" through which "authors earn[] their placement in the Northwestern University Law Review by writing better scholarship than the articles that were rejected," *id.* ¶ 86, but it includes no further details regarding this process.

### B. Alleged Discrimination

NLR's website states that it "does not discriminate on the basis of race, ethnicity, religion, socioeconomic background, disability, nationality, sexual orientation, gender

orientation and identity, or ideological perspective." *Id.* ¶ 82 (citation omitted). However, FASORP alleges that this is a "bald-faced lie" because NLR's student editors "give discriminatory preferences to women, racial minorities, homosexuals, and transgender people when selecting their members and editors." *Id.* ¶¶ 81–82. FASORP further alleges that NLR's student editors "give discriminatory preferences to articles written by women, racial minorities, homosexuals, or transgender people, while rejecting far better articles written by white men." *Id.*

To support these claims of discrimination, FASORP first alleges that NLR "established a position on its editorial board for a 'senior equity and inclusion editor.'" *Id.* ¶ 84. FASORP alleges that this position is meant "to ensure that women, racial minorities, and homosexual and transgender individuals are given illegal discriminatory preferences over white heterosexual and non-transgender men, both with respect to the selection of student members and editors as well as the selection of articles." *Id.* FASORP does not include any detailed factual allegations regarding this position. For example, it is unclear to what extent this editor is involved in the member, editor, and article selection processes or how they ensure that NLR gives certain applicants discriminatory preferences, as FASORP claims. And FASORP's allegation that this editor "oversees and encourages [NLR's] violations of federal anti-discrimination laws" is seemingly inconsistent with its allegation that this editor "repeatedly confirmed" NLR's "compliance with all applicable law" during discussions with Northwestern's general counsel. *Id.* ¶¶ 90, 102. To reconcile this contradiction, FASORP speculates that "[t]here would be no need for the Law Review to consult with the university's general counsel if it were using colorblind and sex-neutral selection practices" and "there would be no need to involve the 'senior equity and inclusion editor' in these discussions unless the Law Review was seeking validation for its discriminatory race and sex preferences." *Id.* ¶ 90.

FASORP also supports its allegations of discrimination by pointing to the non-disclosure agreements ("NDAs") that NLR asks its members to sign. FASORP alleges that these are meant to "prevent[] [NLR's members] from exposing the race and sex preferences that the Law Review uses when selecting its articles, editors, and members." *Id.* ¶ 88. FASORP attached a 2023 NDA as an exhibit to the complaint, which specifies that it is meant to "prevent[] the unauthorized disclosure of Confidential Information," including Write-On submissions, scoring rubrics, and scores; student grade-point averages; and "debates related to the selection of the *Northwestern University Law Review* Volume 118 membership." Doc. 1-6 at 1. FASORP further alleges that, "[w]hen FASORP initially used [sic] Northwestern over its illegal race and sex preferences in July of 2022," NLR "sent a missive" reminding its members of their obligations under the NDAs and instructed them to use discretion in written communication. Doc. 1 ¶ 88. FASORP concludes that this "would not be necessary if the Law Review were selecting its articles, editors, and members in a colorblind and sex-neutral fashion." *Id.* ¶ 89. FASORP attached this communication to the complaint as an exhibit. Doc. 1-5.

FASORP also includes two discrete examples of this alleged discrimination at play. Regarding the member and editor selection process, FASORP alleges that NLR "rejected an application from a white male student" in 2021 "who had a first-year grade point average of over 4.0, while accepting female and minority students with much lower first-year grades." *Id.* ¶ 85. And regarding the article selection process, FASORP alleges that NLR's Issue 3 of Volume 118 consisted "only of articles written by black women." *Id.* ¶ 86. FASORP alleges that the editors decided to do this intentionally to "promote the careers of these black women academics because of their race and sex." *Id.* ¶ 86. One of the articles allegedly "contains numerous instances of plagiarism," and FASORP concludes from this that NLR "would prefer to publish articles with

plagiarism (and articles written by serial plagiarists) as long as the authors are black women, rather than publish scholarship from members of other demographics who respect and follow the requirements of academic integrity." *Id.* ¶ 87.

## III. Allegations Regarding Standing

FASORP alleges that it "has members who are ready and able to apply for entry-level and lateral faculty positions at Northwestern University's law school," as well as "members who have submitted articles to the Northwestern University Law Review, who are ready and able to submit articles to the Northwestern University Law Review, and who intend to submit their future scholarship to the Northwestern University Law Review." *Id.* ¶ 104. Specifically, the complaint identifies three FASORP members, all of whom are heterosexual, cisgender white men who currently work as tenured or tenure-track law professors at ABA-accredited law schools. Given their current positions as law professors, they are eligible to apply to Northwestern Law only as lateral candidates.

First, Individual A is a tenure-track law professor at an ABA-accredited law school with a J.D. and a Ph.D. in political science. He has published over fifteen scholarly articles and one book. He previously applied for a tenure-track position as an entry-level candidate at Northwestern Law when he submitted his application to the Faculty Appointments Register. He has since informed "at least one person on Northwestern's law faculty of [his] interest in a lateral faculty appointment," and intends to "continue doing so each year until [he] receive[s] a faculty appointment at Northwestern." *Id.* ¶ 113. Individual A has also submitted at least one manuscript to NLR, which NLR rejected. At the time the complaint was filed, he was working on another article that he intended to submit to NLR in either February or August 2025.

Next, Individual B is a tenured law professor at an ABA-accredited law school with "more than 20 years of experience as a scholar and teacher." *Id.* ¶ 115. He has published over thirty scholarly articles and has served as a visiting professor at a "top-five law school." *Id.* He has also submitted several previous manuscripts to NLR, but the "vast majority" were rejected. *Id.* ¶ 120. At the time the complaint was filed, he was working on another article that he intended to submit to NLR in either February or August 2025.

Finally, Individual C is also a tenured law professor at an ABA-accredited law school with "more than 20 years of experience as a scholar and teacher." *Id.* ¶ 116. He has published over fifty scholarly articles or book chapters and one book, and he has also served as a visiting professor at a "top-five law school." *Id.* Similarly to Individual A, Individual C has informed "at least one person on Northwestern's law faculty of [his] interest in a lateral faculty appointment," and intends to "continue doing so each year until [he] receive[s] a faculty appointment at Northwestern." *Id.* ¶ 113. Individual C has also submitted at least seven manuscripts to NLR, all of which were rejected. At the time the complaint was filed, he was working on two articles which he intended to submit to NLR in either August 2025 or February 2026.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The standard of review for a Rule 12(b)(1) motion to dismiss depends on whether the defendant raises a facial or factual challenge. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). If, as here, a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's

favor. *Id.* "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly–Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174.

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Article III Standing

The Court starts with Article III standing, which "is a threshold question in every federal case because if the litigants do not have standing to raise their claims the court is without authority to consider the merits of the action." *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016) (quoting *Freedom from Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1467 (7th Cir. 1988)).

FASORP invokes associational standing, which permits an organization to sue on behalf of its members "even without a showing of injury to the association itself." *Prairie Rivers*

*Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1008 (7th Cir. 2021) (quoting *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 552 (1996)). FASORP therefore must establish that "(1) at least one of its members would 'have standing to sue in their own right'; (2) 'the interests it seeks to protect are germane to the organization's purpose'; and (3) 'neither the claim asserted nor the relief requested requires the participation of individual members.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Defendants do not dispute that FASORP satisfies the second and third elements and instead focus their arguments only on the first element, which requires FASORP to establish that one or more of its members "have suffered a concrete injury-in-fact that would support individual Article III standing." *Ill. Nurses Ass'n v. Rosenblatt*, No. 24 CV 12379, 2025 WL 2430571, at *3 (N.D. Ill. Aug. 22, 2025) (citing *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017)). Specifically, FASORP must plausibly allege that it has at least one member who "(1) suffered an [actual or imminently threatened] injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). At the pleading stage, the plaintiff must plead "concrete facts" to show a substantial risk of harm, and "cannot rely on speculation about 'the unfettered choices made by independent actors not before the courts.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) (quoting *Lujan*, 504 U.S. at 562). And to the extent that the alleged injury in fact is a threatened injury, rather than an actual injury, it must be "certainly impeding," and "allegations of *possible* future injury are not sufficient." *Id.* at 409, 414 n.5 (citations omitted) (internal quotation marks omitted).

Further, because FASORP is seeking injunctive and declaratory relief, it must also show a likelihood of future harm, meaning "a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). FASORP must demonstrate standing with respect to each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (citing *Lyons*, 461 U.S. at 109).

**A. Northwestern Law's Faculty Hiring Processes**

FASORP first seeks to challenge Northwestern Law's entry-level and lateral faculty hiring processes. FASORP can "establish standing to challenge [a] hiring process . . . by showing that" at least one of its members "would have been 'able and ready' to apply for" the position in the reasonably foreseeable future. *Tarpley v. Jeffers*, 96 F.3d 921, 924 (7th Cir. 1996); *see also Carney v. Adams*, 592 U.S. 53, 63 (2020) (holding that plaintiff lacked standing because he was not "able and ready" to apply for the position "in the reasonably foreseeable future"). Defendants argue that FASORP lacks standing to challenge either of Northwestern Law's faculty hiring process because it has not adequately alleged that any of its members are ready and able to apply for entry-level or lateral faculty positions.

Starting with the lateral faculty hiring process, the Court concludes that FASORP has pleaded sufficient facts to establish standing at this stage of the case. FASORP alleges that at least two of its members, Individuals A and C, have "already informed at least one person on Northwestern's law faculty of their interest in a lateral faculty appointment," which is how lateral candidates typically apply for law-school faculty appointments. Doc. 1 ¶ 113. These members allegedly intend to continue applying in this way each year until they receive a faculty appointment. FASORP further alleges that these members are eligible to apply as lateral candidates, given their current positions as law professors at ABA-accredited law schools and

other qualifications. Finally, they allege that Individuals A and C will face discrimination when they apply, supporting this with allegations that Defendants and other Northwestern Law faculty have discriminated against specific faculty applicants due to their race or gender in the past. These allegations are sufficient to establish associational standing.

Defendants' arguments to the contrary are unpersuasive because they seek to impose a higher standard than that required at the pleading stage. For example, they argue that FASORP fails to allege to "whom or in what manner [Individuals A and C] expressed [their] interest" in a faculty appointment or whether they "asked, let alone convinced, any faculty member to intercede with the appointments committee." Doc. 27 at 9–10. They further argue that FASORP failed to provide detailed information about Individuals A, B, and C's qualifications, such as their areas of expertise, academic records, class rankings, and whether other law schools have offered them lateral positions. Notably, however, none of the cited caselaw holds that this granular level of detail is necessary at the pleading stage. And this is unsurprising because the Supreme Court has confirmed that, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to establish standing, "for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561.

Further, the prior cases dismissing similar claims brought by FASORP for lack of Article III standing are clearly distinguishable. In both prior cases, the courts dismissed the hiring claims because the complaints did not identify any specific FASORP members who had standing in their own right. *FASORP v. Harv. L. Rev. Ass'n*, No. CV 18-12105, 2019 WL 3754023, at *5–6 (D. Mass. Aug. 8, 2019) ("Nowhere, however, does the Amended Complaint 'identify'—in any sense of that word—a member of either plaintiff association, let alone one who has suffered

or will suffer the requisite injury."); *FASORP v. N.Y.U. L. Rev.*, No. 18 CIV. 9184, 2020 WL 1529311, at *5 (S.D.N.Y. Mar. 31, 2020) ("*N.Y.U. I*") ("[I]t is clear that a plaintiff association must at minimum, identify one injured member with specific allegations, which FASORP fails to do."), *aff'd sub nom. Fac. v. N.Y.U.*, 11 F.4th 68 (2d Cir. 2021) ("*N.Y.U. II*"). Here, in comparison, the complaint identifies three specific members—Individuals A, B, and C—and includes specific factual allegations regarding their readiness and ability to apply for a lateral faculty position at Northwestern Law.

Defendants also cite *Lowery v. Texas A&M University*, No. 23-20481, 2024 WL 4614714 (5th Cir. Oct. 30, 2024), but this case is likewise distinguishable. In *Lowery*, the Fifth Circuit dismissed similar claims brought by a professor who alleged that he was able and ready to apply for a lateral faculty position at Texas A&M University. *Id.* at *1. The court concluded that he lacked standing because he "never submitted an application to substantiate his interest." *Id.* That is not the case here. Although Individuals A and C did not submit a formal application, FASORP alleges that lateral faculty candidates "do not submit documents or go through a formalized [application] process" and instead apply by "inform[ing] friends or acquaintances on the faculty of their interest in seeking a position." Doc. 1 ¶ 113. FASORP therefore alleges that Individuals A and C essentially applied to the positions by "inform[ing] at least one person on Northwestern's law faculty of their interest in a lateral faculty appointment." *Id.* The Court presumes these factual allegations to be true at this stage of the case, and *Lowery* is thus inapposite.

That said, while Individuals A and C have standing to challenge the lateral hiring process, it does not follow that they necessarily have standing to challenge the entry-level hiring process. While FASORP argues that it "is not bringing separate challenges to Northwestern's entry-level

and lateral hiring," Doc. 33 at 8 n.19, the complaint is clear that these are two distinct processes. And FASORP is seeking relief that would apply to both the lateral and entry-level hiring processes. *See* Doc. 33 at 8 n.19 ("[FASORP] is seeking relief that would bar Northwestern from awarding discriminatory preferences to women, racial minorities, homosexuals, or transgender people in *any* of its faculty-hiring decisions." (citing Doc. 1 ¶ 161)). FASORP must demonstrate standing with respect to each form of relief sought, *Friends of the Earth*, 528 U.S. at 185, yet it fails to identify any member who is ready and able to apply for an entry-level faculty position at Northwestern Law. To the contrary, it admits that Individuals A, B, and C are not even eligible to apply as entry level applicants. Therefore, with respect to the entry-level hiring process, FASORP has not sufficiently alleged that it has associational standing.

**B. Northwestern Law Review's Member and Editor Selection Process**

FASORP also seeks to challenge NLR's member and editor selection processes. Defendants argue that FASORP lacks associational standing to challenge this process because it does not allege that one or more of its members are students at Northwestern Law who intend to apply for a member or editor position. FASORP does not dispute that its membership does not include any students who applied or intend to apply to become a NLR member or editor. Instead, FASORP argues that NLR's member and editor selection practices will "inflict[] injury in fact" on Individuals A, B, and C when they submit manuscripts to NLR for consideration. Doc. 1 ¶ 118. This is because, according to FASORP, NLR's selection practices result in Individuals A, B, and C's submissions being "judged by students with lower academic credentials and abilities." *Id.* FASORP further alleges that this selection process inflicts injury in fact on Individuals A, B, and C because "students whose membership on the law review is

attributable to race and sex preferences are more likely to discriminate against articles written by white, heterosexual men." *Id.*

The Court agrees with Defendants that these allegations are not sufficient to establish associational standing. Rather than establishing a certainly impending injury or substantial risk of harm to one of its' members, FASORP's allegations amount to nothing more than conjecture about what *might* happen in the future. As another district court analyzing this same issue explained:

> Even taking every reasonable inference in FASORP's favor, the amended complaint shows that FASORP's alleged threatened injury–being subject to discriminatory treatment–would only take place if: (1) a faculty member of FASORP authors a legal article at some point in the future; (2) that member submits that article to the Law Review; (3) the Law Review members are indeed composed of students that had chosen to identify their race and gender as noteworthy characteristics in their personal statements or resumes, and had received preferential treatments as a result thereof; (4) those students are 'less capable' than students selected only on the basis of grades and other diversity factors; (5) the faculty member of FASORP volunteers his race and gender information, which the Law Review then uses to either give less weight to or reject his article; and (5) if those articles are accepted for publication, the Law Review would staff those "less capable" students as editors on those articles. Such a "highly attenuated chain of possibilities" cannot support standing, as a plaintiff cannot "manufacture standing merely by inflicting harm on [its] fear of hypothetical future harm that is not certainly impending."

*N.Y.U. I*, 2020 WL 1529311, at *6 (alteration in original) (citation omitted).

The same is true here. The complaint alleges that students "are encouraged" to disclose information regarding their race, sex, gender, and/or sexual orientation in their personal statements. It is silent, however, as to whether applicants actually disclose this information and, if so, how many applicants disclose this information. Additionally, the complaint lacks the factual allegations necessary to support its conclusory assertion that NLR editors discriminate against heterosexual, cisgender white men when selecting members and editors. At most,

FASORP alleges that NLR (1) rejected one white male with an over 4.0 grade point average in 2021, (2) established a position on its editorial board for a senior equity and inclusion editor, and (3) asks its members to sign NDAs and use discretion in written communications regarding the selection process. The Court cannot plausibly infer from these allegations alone that NLR's review editors generally discriminate during the member and editor selection process, particularly considering NLR's expressly stated anti-discrimination policy. *See Doe v. N.Y.U.*, No. 23-CV-10515, 2024 WL 2847368, at *4 (S.D.N.Y. May 30, 2024) (analyzing similar allegations and concluding that "[e]ven if I were to indulge Doe's belief that some students will reveal this information in their application, it is a speculative leap to conclude that the Law Review is flouting its own facially neutral policy for selecting new editors and instead impermissibly relying on the sex, gender, race, or sexuality of applicants").

Even if FASORP had plausibly alleged that NLR's member and editor selection process is discriminatory, however, FASORP would still lack standing because it has not established that at least one of its members faces a certainly impending injury because of this process. While FASORP alleges that the unknown number of "students whose membership on the law review is attributable to race and sex preferences are *more likely* to discriminate against articles written by" Individuals A, B, and C, Doc. 1 ¶ 118 (emphasis added), this does nothing to establish a certainly impeding injury. The law is clear that "fears of hypothetical future harm" or "speculation about 'unfettered choices made by independent actors' [are] too attenuated" to establish standing. *Maly v. Ill. State Bd. of Elections*, No. 24-2979, 2025 WL 3493943, at *2 (7th Cir. Dec. 5, 2025) (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)).

FASORP also argues that Individuals A, B, and C will suffer injury in fact from NLR's editor and member selection process because they will have their submissions judged by less qualified members and editors. However, the Court cannot agree that this is an injury in fact, meaning an "invasion of a legally protected interest." *Lujan*, 504 U.S. at 555. As other courts analyzing this issue have concluded, FASORP's members "have suffered no injury in fact from the Law Review's membership and articles selection process because there is no legally protected interest in having one's academic work evaluated by the most 'capable' students." *N.Y.U. I*, 2020 WL 1529311, at *6; *see also Harv. L. Rev.*, 2019 WL 3754023, at *7 ("Authors who believe that their submissions to HLRA are judged and edited by less capable students as a result of the member-selection policy lack standing to challenge that policy on behalf of the students directly impacted by it."). And while FASORP attempts to analogize this injury to the injury alleged in *Powers v. Ohio*, 499 U.S. 400 (1991), this argument fails. *Powers* held that a criminal defendant had standing to challenge a discriminatory jury selection process because racial discrimination during the jury selection process is "a constitutional violation committed in open court," which undermines "[t]he purpose of the jury system." *Id.* at 412–13. Those considerations are not present in this case. *See N.Y.U. I*, 2020 WL 1529311, at *6 (distinguishing *Powers* because "unlike a criminal defendant's constitutional right to a fair trial and hence a fairly selected jury, there is no legal right to have one's article reviewed or published by a student-run academic law journal"); *see also N.Y.U. II*, 11 F.4th at 77 ("*Powers* depended on special considerations relating to criminal justice that are inapplicable here").

Therefore, the Court concludes that FASORP does not have standing to challenge NLR's member or editor selection process.

### C. Northwestern Law Review's Article Selection Process

FASORP also challenges NLR's article selection process, alleging that this process inflicts injury in fact on Individuals A, B, and C because it prevents them "from competing with other authors who submit articles to the law review on an equal basis." Doc. 1 ¶ 117. Many of the allegations supporting this theory overlap with the allegations supporting the member and editor selection theory. FASORP again alleges that NLR established a position on its editorial board for a senior equity and inclusion editor and asks its members to sign NDAs regarding the selection process. Additionally, FASORP alleges that NLR published Issue 3 of Volume 118 and intentionally chose to include only articles written by black women.

As with the member and editor selection process, it is a "speculative leap" to conclude, based on these allegations alone, that NLR is violating its express anti-discrimination policy and discriminating against straight, white men during the article selection process. *Doe*, 2024 WL 2847368, at *4. FASORP does not allege, for example, that the authors disclose their race or gender when submitting articles for review. Nor does it provide any allegations regarding the selection process itself. And without any allegations to plausibly support an inference of current discrimination, the allegation that NLR previously published a single issue consisting of articles written only by black women does not, in it of itself, confer standing for injunctive relief. *See LaRosa ex rel. LaRosa v. Walgreen Co.*, No. 12 C 932, 2012 WL 2526661, at *3 (N.D. Ill. June 29, 2012) (holding that allegations of past discrimination are insufficient to demonstrate standing for injunctive relief); *Perry L. v. Milwaukee Montessori Sch.*, No. 22-CV-1244, 2025 WL 1191025, at *3 (E.D. Wis. Apr. 24, 2025) ("Plaintiffs cannot base their standing to sue for injunctive relief on allegations of past discrimination by Milwaukee Montessori.").

For these reasons, the Court concludes that FASORP does not have standing to challenge NLR's article selection process.

### D. Other Relief[4]

Finally, FASORP seemingly challenges Northwestern Law's faculty promotion, retention, discipline, and compensation practices. *See* Doc. 1 ¶ 161 (requesting that the Court (1) "permanently enjoin" Defendants "from considering race, sex, sexual orientation, or gender identity in the appointment, promotion, retention, or compensation of its faculty" and (2) "appoint a court monitor to oversee all decisions relating to the appointment, promotion, and compensation of faculty"); *see also id.* ¶ 30 (alleging that Northwestern Law promoted Peery because "Nadler wanted a black female promoted to associate professor despite Peery's failure to produce adequate scholarship"); *id.* ¶ 78 (alleging that Northwestern Law refused to "impos[e] any sanctions or corrective measures" on a black female professor for alleged plagiarism). FASORP does not identify any members who would have standing to sue in their own right regarding these policies or practices. It does not even allege that any of its members are faculty at Northwestern Law, let alone faculty who have been or will be harmed by Northwestern Law's faculty promotion, retention, discipline, or compensation practices. The Court therefore concludes that FASORP does not have associational standing to challenge Northwestern Law's promotion, retention, discipline, or compensation of its faculty.

## II. Failure to State a Claim

Defendants also argue that the Court should dismiss FASORP's claims pursuant to Rule 12(b)(6). Because FASORP lacks standing to challenge the entry-level faculty hiring process, NLR's selection processes, or the faculty promotion, retention, discipline, and compensation

[4] Defendants do not challenge FASORP's standing to seek this relief, but "[w]hen a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012).

practices, the Court analyzes only whether FASORP has sufficiently stated claims based on Northwestern Law's lateral faculty hiring process.[5]

### A. Title VI Claim

FASORP first asserts a Title VI claim, alleging that Defendants discriminate "in favor of racial minorities and against whites" during Northwestern Law's lateral faculty hiring process. Doc. 1 ¶ 140. Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d.

The Court agrees with Defendants that FASORP cannot maintain a Title VI employment discrimination claim based on the allegations in the complaint. The Seventh Circuit has made clear that "Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." *Ahern v. Bd. of Educ.*, 133 F.3d 975, 978 (7th Cir. 1998) (citation omitted). The Court addresses each of these potential exceptions in turn.

Starting with the first *Ahern* exception, FASORP has fallen far short of establishing that any of Northwestern's federal funding has a primary objective of providing employment. At most, the complaint alleges generally that the federal government provides "research grants . . . to institutions such as Northwestern" that are "used to employ university faculty on research

[5] The Court acknowledges FASORP's request for the Court to "conditionally rule on the defendants' Rule 12(b)(6) motion even if it decides to dismiss under Rule 12(b)(1) for lack of subject-matter jurisdiction." Doc. 33 at 17 n.34. However, the Court declines to do so, as "a court may not presume hypothetical jurisdiction in order to decide a question on the merits." *Leibovitch v. Islamic Republic of Iran*, 697 F.3d 561, 573 (7th Cir. 2012); *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101 (1998) ("Hypothetical jurisdiction produces nothing more than a hypothetical judgment—which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning.").

tasks that the federal government wishes to fund." Doc. 1 ¶ 134. Even if the Court were to infer from these sparse allegations that (1) Northwestern itself receives such research grants and (2) Northwestern uses those grants to employ law faculty, it still cannot conclude that the first *Ahern* exception applies. The mere fact that federal funds support employment does not, in and of itself, establish that employment is the *primary objective* of that funding. *See, e.g.*, *Rosas v. Bd. of Educ.*, No. 19-CV-2778, 2025 WL 2712293, at *11 n.12 (N.D. Ill. Sept. 23, 2025) ("[T]he fact that an educational institution puts federal funds towards teacher salaries does not on its own establish that the primary objective of those funds are employment."); *Cieslik v. Bd. of Educ.*, No. 1:19-CV-05553, 2021 WL 1172575, at *3 (N.D. Ill. Mar. 29, 2021) (holding that the primary objective of federal funding was "to educate *students*," even though it was also "used to support instruction and to pay instructional salaries");[6] *Veljkovic v. Bd. of Educ.*, No. 20 C 1551, 2020 WL 7626735, at *3 (N.D. Ill. Dec. 22, 2020) (holding that the primary objective of the federal aid was "to educate students" and "employing teachers [was] only a means to that end").

In its response, FASORP argues that Northwestern specifically receives federal funding "from the National Science Foundation, the National Institutes for Health, and the National Endowment for the Humanities." Doc. 33 at 27; *see also* Doc. 33-2; Doc. 33-3; Doc. 33-4.[7]

[6] FASORP attempts to distinguish *Cieslik* by arguing that "it holds only that 'students . . . are the primary beneficiaries *of Title I funding*" and "Northwestern University does not receive Title I money." Doc. 33 at 27 (citing *Cieslik*, 2021 WL 1172575, at *3). However, they fail to address the broader conclusion of *Cieslik* that a Title VI employment discrimination plaintiff must allege that "employment is the primary objective of [the] federal funding," and the mere fact that federal funding supports employment incidentally is not, in and of itself, enough. 2021 WL 1172575, at *3. FASORP cites no authority for the proposition that this conclusion applies *only* in the context of Title I funding.

[7] The Court can properly consider the allegations in FASORP's "response brief and attachments to the extent that they are consistent with the complaint." *Cole v. Ill. Dep't of Healthcare & Fam. Servs.*, No. 22-CV-3248, 2025 WL 965716, at *2 (C.D. Ill. Mar. 31, 2025) (citing *Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017)); *see also Help At Home Inc. v. Med. Cap., L.L.C.*, 260 F.3d 748, 752–53 (7th Cir. 2001) ("'A plaintiff need not put all of the essential facts in the complaint; he may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint.").

While FASORP argues that these funds primarily benefit university faculty, none of the exhibits cited support this proposition. This is expected, given that the statutorily defined purposes of these agencies and the funding they provide is to support research, education, and/or scholarship, not employment. 42 U.S.C.A. § 1862 (authorizing the National Science Foundation "to initiate and support scientific and engineering research, including applied research, at academic and other nonprofit institutions"); 42 U.S.C. § 282(b)(7)(B) (authorizing the National Institutes of Health to allocate funds for the purposes of "conducting and supporting research"); 20 U.S.C. § 956(c)(1)–(10) (authorizing the National Endowment of Humanities to provide grants and loans for the purpose of supporting research, education, and scholarship "in the humanities"). Because employment is not the primary objective of this federal funding, the first *Ahern* exception does not apply. *See Cieslik*, 2021 WL 117257, at *3 (analyzing the "statutorily defined purpose" of federal funds to determine whether employment was the primary objective).

Nor does FASORP establish that the second *Ahern* exception applies in this case. While FASORP alleges that discrimination during the faculty hiring processes necessarily causes discrimination against the primary beneficiaries of federal aid, "as university faculty are 'primary beneficiaries' of federal research grants as well as the subsidized grants and loans that the federal government provides to university students," Doc. 1 ¶ 134, such conclusory allegations are insufficient to avoid dismissal. *See Twombly*, 550 U.S. at 545 (holding that a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do"). FASORP includes no factual allegations to support an inference that Northwestern Law faculty are the primary beneficiaries of these forms of federal aid; to the contrary, the complaint admits elsewhere that "students are the primary beneficiaries" of at least some of this funding. Doc. 1 ¶ 130.

Because neither *Ahern* exception applies in this case, FASORP cannot maintain its Title VI employment discrimination claim. The Court grants Defendants' motion to dismiss FASORP's Title VI claim and does not address Defendants' alternative arguments for dismissal.

**B. Title IX Claim**

FASORP also brings a Title IX claim against Defendants, alleging that they "are violating Title IX by discriminating in favor of female faculty candidates and against men" and "are also violating Title IX by discriminating in favor of homosexual or transgender faculty candidates and against faculty candidates who are heterosexual and identify and act in accordance with their biological sex." Doc. 1 ¶ 145. Defendants argue, and FASORP agrees, that this claim cannot proceed given the holding of *Waid*, 91 F.3d at 861–63. The Court therefore grants Defendants' motion to dismiss the Title IX claim.

**C. Title VII Claim**

FASORP also asserts a claim under Title VII, which makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Specifically, FASORP alleges that Defendants "are violating Title VII by discriminating in favor of females, racial minorities, homosexuals, and transgender persons and against white men who are neither heterosexual nor transgender in their faculty-hiring decisions." Doc. 1 ¶ 158.

Defendants understandably initially interpreted the complaint to be alleging a failure-to-hire Title VII claim. However, FASORP clarifies in its response that this is not the case. Instead, FASORP argues that it is alleging "an ongoing and future violation of Title VII simply

from the fact that its members will face a competitive disadvantage relative to female or minority faculty candidates when they apply for faculty positions at Northwestern, and that violation of Title VII remains no matter whom Northwestern ultimately decides (or decided) to hire." Doc. 33 at 33. Rather than supporting FASORP's position, however, this argument only serves to underscore the need for dismissal.

As Defendants correctly point out, regardless of the legal theory on which FASORP bases its Title VII claim, FASORP "'must show some harm respecting an identifiable term or condition of employment' to state a Title VII claim." Doc. 40 at 17 (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024)). This means that, to survive a motion to dismiss, a complaint asserting a Title VII discrimination claim must allege "that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of" their membership in a protected class. *Shankle v. Vill. of Melrose Park*, No. 16 C 2582, 2018 WL 844422, at *2 (N.D. Ill. Feb. 12, 2018) (collecting cases); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008) ("[I]n order to prevent dismissal under Rule 12(b)(6), a complaint alleging . . . discrimination need only aver that the employer instituted a (specified) adverse employment action against the plaintiff on the basis of her [membership in a protected class]."). The Seventh Circuit has explained that this adverse employment action "must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007)

Here, FASORP has not alleged that Northwestern instituted any adverse employment actions against any FASORP members. At most, FASORP alleges that Individuals A, B, and C will "face a competitive disadvantage" during the faculty hiring process. Doc. 33 at 33. This

alleged disadvantage, standing alone, is not an adverse employment action. FASORP does not allege that this disadvantage results in a significant change in employment status or benefits; to the contrary, it argues that the "violation of Title VII remains no matter whom Northwestern ultimately decides (or decided) to hire." *Id*. FASORP provides no authority to support this argument, and the Court will not ignore the binding Seventh Circuit precedent requiring plaintiff to allege an adverse employment action.

For this reason, the Court dismisses FASORP's Title VII claim.

**D. Section 1981 Claim**

Finally, FASORP asserts an employment discrimination claim under Section 1981, which "provides a federal remedy against racial discrimination in private employment." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789–90 (7th Cir. 2019). Defendants argue that FASORP has failed to state a Section 1981 claim, and the Court agrees.

To survive a motion to dismiss, a Section 1981 plaintiff must "plead . . . that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). More specifically, "a plaintiff claiming employment discrimination under section 1981 must allege that her employer 'instituted a specific adverse employment action against' her because of her race." *Sanchez v. Tootsie Roll Indus., LLC*, No. 19-CV-4527, 2021 WL 4936240, at *5 (N.D. Ill. May 18, 2021). The causation requirement is "robust" even at the pleading stage. *Id.*

FASORP's claim fails from the start because, as explained in the previous section, FASORP does not allege that Defendants instituted or will institute any specific adverse employment actions against its members. FASORP also does not dispute that it failed to allege but-for causation. This is fatal, given the holding of *Comcast*, 589 U.S. at 341.

FASORP nonetheless argues that it need not allege but-for causation because it is seeking only forward-looking relief. Specifically, FASORP believes that it "need only satisfy the four-part test for a permanent injunction" and sufficiently allege that the "request for declaratory relief satisfies Article III's case or controversy requirement by redressing an injury in fact." Doc. 33 at 30–31. This argument is baseless because Supreme Court precedent clearly holds that a plaintiff must initially plead but-for causation to state a Section 1981 claim. *Comcast*, 589 U.S. at 341. Tellingly, FASORP cites no cases overruling or distinguishing this precedent, and instead relies on cases (1) holding that the prohibition against discrimination in Section 1981 is co-extensive with the Equal Protection Clause and (2) discussing the general standards for injunctive and declarative relief. None of these cases even discuss the pleading standards for Section 1981 claims, nor do they hold that but-for causation is not required in Section 1981 cases seeking only forward-looking relief.

The Court therefore dismisses FASORP's Section 1981 claim and does not address Defendants' alternative arguments for dismissal.

**E. Individual Defendants**

Finally, Defendants ask the Court to dismiss the claims brought against the Individual Defendants, arguing that (1) these claims are redundant and (2) Title VI and Title IX claims can not be asserted against an individual defendant. FASORP responds that it has "no quarrel" with this request, Doc. 33 at 17 n.35, and the Court therefore dismisses the claims asserted against the Individual Defendants.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss [27] and dismisses the complaint without prejudice.

Dated: January 22, 2026

SARA L. ELLIS
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF NextGen 1.8 (rev. 1.8.3)**
**Eastern Division**

Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP)

Plaintiff,

v.

Case No.: 1:25−cv−01129
Honorable Sara L. Ellis

Northwestern University, et al.

Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, September 10, 2025:

MINUTE entry before the Honorable Sara L. Ellis: Telephone conference held on 9/10/2025. As indicated on the record, the Court awards Defendants $60,000 in fees as the sanction, which is ordered to be paid by Plaintiff before the next hearing date. The Court sets a ruling date for 11/5/2025 at 9:30 AM for ruling on the motion to dismiss. Attorneys/Parties should appear for the hearing by calling the Toll−Free Number: (650) 479−3207, Access Code: 2314 361 1508. Throughout the telephonic hearing, each speaker will be expected to identify themselves for the record before speaking. Please note that the conference call−in will be used by all cases that are on the court's calendar for the said date, therefore counsel must be in a quiet area while on the line and must have the telephone muted until your case is called. Members of the public and media will be able to call in to listen to this hearing (use toll−free number). Please be sure to keep your phone on mute when you are not speaking. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting court proceedings. Violation of these prohibitions may result in sanctions, including removal of court−issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Emailed notice(rj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FACULTY, ALUMNI, AND STUDENTS OPPOSED TO RACIAL PREFERENCES (FASORP),<br><br>Plaintiff,<br><br>v.<br><br>NORTHWESTERN UNIVERSITY; HARI OSOFSKY, in her official capacity as dean of Northwestern University School of Law; SARAH LAWSKY, JANICE NADLER, and DANIEL RODRIGUEZ, in their official Capacities as professors of law at Northwestern University; DHEVEN UNNI, in his official Capacity as editor in chief of the Northwestern University Law Review; JAZMYNE DENMAN, in her official capacity as senior equity and inclusion editor of the Northwestern University Law Review,<br><br>Defendants. | ) | No. 25 C 1129<br><br>Judge Sara L. Ellis |

**ORDER**

The Court grants in part and denies in part Defendants' Rule 41(d) motion for an award of fees and costs in Case No. 24-cv-5558 and a stay of this suit pending payment thereof [17]. The Court awards Defendants the court costs they incurred in Case No. 24-cv-5558 and reasonable attorneys' fees incurred in connection with the filing of this Rule 41(d) motion. The Court orders the parties to confer on the amount of the allowable costs and attorneys' fees, and to come to an agreement if possible. If the parties cannot agree on the amount Plaintiff shall pay to Defendants, the parties should file a joint statement setting forth their positions, accompanied by supporting documentation, by August 22, 2025. The Court sets a further status hearing for September 10, 2025 at 9:30 AM. See Statement.

**STATEMENT**

In July 2024, Plaintiff Faculty, Alumni, and Students Opposed to Racial Preferences (FASORP) filed suit against Defendants Northwestern University ("Northwestern"); Hari Osofsky, in her official capacity as dean of Northwestern's Law School; Sarah Lawsky, Janice Nadler, and Daniel Rodriguez, in their official capacities as Northwestern Law professors; Dheven Unni, in his official capacity as editor in chief of the Northwestern Law Review; and

Jazmyne Denman, in her official capacity as senior equity and inclusion editor of the Northwestern Law Review. No. 24-cv-5558 (N.D. Ill.) (the "2024 case"). In the 2024 case, FASORP claimed that Defendants discriminate against white men in faculty hiring and the selection of members and editors of, and articles that appear in, the Northwestern Law Review. Defendants moved to dismiss FASORP's claims, with FASORP filing an amended complaint in response. Defendants again moved to dismiss, and FASORP filed a response. On December 26, 2024, FASORP filed a notice that it intended to seek leave to amend its complaint to add a Title VII claim against Northwestern after having received a right to sue letter. FASORP thereafter filed a motion for leave to file a second amended complaint, which Defendants opposed. The Court indicated it would hold an in-person hearing on February 5, 2025, for ruling on the motion. It further stated that it would inform the parties before February 5 if it would rule without need for a hearing. But before that hearing could take place, on January 31, 2025, FASORP dismissed the 2024 case without prejudice and filed this case (the "2025 case") against Defendants. In the 2025 case, FASORP reasserted the claims from the 2024 case and also added a Title VII claim against Northwestern. Given FASORP's indication on the civil cover sheet that the 2025 case was a refiling of a previously dismissed case, the 2025 case was directly assigned to this Court. In the 2025 case, the parties are again briefing a motion to dismiss.

Defendants now ask the Court to award them the attorneys' fees and costs they incurred in the 2024 case pursuant to Federal Rule of Civil Procedure 41(d).[1] Rule 41(d) provides that "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court . . . may order the plaintiff to pay all or part of the costs of that previous action." Fed. R. Civ. P. 41(d). While Rule 41(d) explicitly allows for the recovery of costs, the Seventh Circuit has also allowed a defendant to recover attorneys' fees where "the substantive statute which formed the basis of the original suit allows for the recovery of such fees as costs (or . . . such fees are specifically ordered by the court)." *Esposito v. Piatrowski*, 223 F.3d 497, 501 (7th Cir. 2000). In other words, the Court may award attorneys' fees in connection with Rule 41(d) if the underlying statute allows or if the Court finds that FASORP "acted in bad faith or inflicted unnecessary costs on the court or the defendants." *New La. Holdings, LLC v. Arrowsmith*, No. 11 C 5031, 2012 WL 6061710, at *10 (N.D. Ill. Dec. 4, 2012); *see also Sanderson v. Spectrum Labs, Inc.*, 248 F.3d 1159 (Table), 2000 WL 1909678, at *5–6 (7th Cir. 2000) (court may award attorneys' fees where the opposing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons" (citation omitted)). 42 U.S.C. § 1988 allows a prevailing defendant to recover attorneys' fees for § 1981, Title VI, and Title IX claims if the plaintiff's claims were "frivolous, unreasonable, or groundless." *Khan v. Gallitano*, 180 F.3d 829, 837 (7th Cir. 1999) (citation omitted).

FASORP has agreed to pay the court costs that Defendants incurred in the 2024 case, but it disputes that Defendants can recover their attorneys' fees.[2] FASORP contends that its decision

[1] Defendants also asked the Court to stay the 2025 case pending FASORP's payment of the awarded fees and costs, but given FASORP's representation that it would promptly pay all ordered fees and costs, Defendants indicate in their reply brief that they no longer request such relief.

[2] FASORP notes that its counsel offered to pay the costs and fees that Defendants reasonably incurred on account of FASORP's decision to dismiss the 2024 case and refile the claims in the 2025 case if they exceed a reasonable estimate of fees and travel costs that FASORP saved Defendants by obviating the

to dismiss the 2024 case and refile its claims in the 2025 case was not frivolous, unreasonable, or done in bad faith. The Court is not convinced. As the Court previously expressed, it does not fully comprehend FASORP's litigation tactics, particularly given that the Court planned to allow FASORP leave to amend in the 2024 case to add the Title VII claim. In other words, although FASORP denies that it undertook the procedural maneuver of dismissal and refiling to avoid an adverse ruling, had that been FASORP's motivation, the actions that prompted this Rule 41(d) motion would have been for naught. But FASORP represents that they were not because, by dismissing and refiling, it avoided an in-person hearing, which saved all parties time and money, and also served FASORP's counsel's personal interests. While the Court does not know the monetary costs the parties would have incurred in connection with the February 5, 2025 scheduled in-person hearing in the 2024 case, the Court agrees with Defendants that in seeking to avoid that hearing, FASORP's unilateral action needlessly delayed the case and inflicted additional costs on Defendants. *See Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (bad faith includes "harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, and recklessly making a frivolous claim" and can "be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation" (citations omitted)). Therefore, the Court finds it appropriate to award Defendants attorneys' fees pursuant to Rule 41(d).[3]

That said, the Court does not agree with Defendants that FASORP's actions warrant an award of all of the attorneys' fees that Defendants incurred in the 2024 case. Courts typically do not allow a defendant to recover fees under Rule 41(d) for work that continues to be useful in the present litigation. *Arrowsmith*, 2012 WL 6061710, at *11. This exception likely covers the majority of the attorneys' fees Defendants incurred in the 2024 case, given that the Court had not made any substantive determinations at the time that FASORP dismissed and refiled its claims, meaning that Defendants could reuse their work from the 2024 case in the 2025 case. The Court also does not find it appropriate to award Defendants the costs associated with opposing FASORP's motion for leave to file an amended complaint in the 2024 case, given that, had the 2024 case continued, the Court intended to grant the motion and have the parties provide supplemental briefing on the Title VII claim. While Defendants complain about the fees that they incurred in preparing for the in-person hearing on the motion to amend that never occurred, the Court does not find that FASORP's actions inflicted these additional costs on Defendants. Defendants would have incurred these costs and more had the in-person hearing taken place and the end result would have been the same, with FASORP alleging a Title VII claim and the parties

---

need for the February 5, 2025 in-person hearing. Defendants did not provide FASORP's counsel with that documentation, choosing instead to pursue their request for all attorneys' fees they incurred in the 2024 case.

[3] In addition to arguing that the Court's inherent power to deter bad faith litigation supports an award of attorneys' fees under Rule 41(d), Defendants contend that the Court should also allow them to recover their fees associated with the motion to dismiss briefing concerning the Title IX faculty hiring claims and the claims against the individual defendants under § 1988. Defendants argue that despite agreeing to the dismissal of these claims in the briefing on the motion to dismiss in the 2024 case, FASORP reasserted them in the 2025 case. The Court does not find it appropriate to opine on the relative merit of FASORP's decision to reassert these claims in the 2025 case at this time and leaves such a determination for a later date if Defendants prevail, when the Court can consider whether FASORP did not have a basis to reassert these claims in the 2025 case so as to preserve its arguments for appeal.

briefing whether or not that claim can continue past the pleading stage. Further, at least some of Defendants' arguments against amendment also pertained to the futility of the Title VII claim, meaning the fees Defendants incurred in opposing amendment did not go to waste. *Cf. Embrey v. St. Charles Trading, Inc.*, No. 23 CV 15232, 2024 WL 916235, at *2 (N.D. Ill. Mar. 4, 2024) ("Courts can order attorneys' fees under Rule 41(d) to 'compensate for the unnecessary expenses incurred by the litigation,' meaning that when plaintiffs refile a case after voluntary dismissal, courts should not impose costs associated with 'work that will still be useful to the defendants in the instant case.'" (quoting *Arrowsmith*, 2012 WL 6061710, at *11)). That said, the Court does find it appropriate to require FASORP to pay Defendants the fees they have incurred in bringing this Rule 41(d) motion. FASORP's procedural maneuver delayed the case and has caused not only the parties but also the Court to devote additional time to resolution of the Rule 41(d) issue instead of focusing on the merits of the claims. Therefore, the Court orders FASORP to pay Defendants' attorneys' fees connected to this motion. *See Arrowsmith*, 2012 WL 6061710, at *13 ("Had Plaintiffs originally filed this action in this District, or had Plaintiffs not chosen to re-file this action, Arrowsmith would not have had to expend time drafting the Costs Motion.").

In summary, the Court requires FASORP to pay to Defendants the court costs Defendants incurred in the 2024 case and the reasonable attorneys' fees Defendants incurred in connection with the filing of this Rule 41(d) motion. The Court orders the parties to confer on the amount of the allowable costs and attorneys' fees and come to an agreement if possible. If the parties cannot agree on the amount FASORP shall pay to Defendants, the parties should file a joint statement setting forth their positions, accompanied by supporting documentation, by August 22, 2025.

Date: May 28, 2025 /s/ Sara L. Ellis